**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:
Marilyn Kelly          Michael F. Cavanagh
                       Elizabeth A. Weaver
                       Maura D. Corrigan
                       Robert P. Young, Jr.
                       Stephen J. Markman
                       Diane M. Hathaway

FILED JUNE 18, 2010

S T A T E   O F   M I C H I G A N

SUPREME COURT

TRENT WOODMAN, a Minor, by his Next
Friend, SHEILA WOODMAN,

      Plaintiff-Appellee,

v                                                          No. 137347

KERA LLC, doing business as BOUNCE
PARTY,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH

YOUNG, J.

I believe this Court must determine whether a preinjury liability waiver signed by a parent on behalf of his child is enforceable under the common law and, if not, whether this Court should change the common law to enforce such a waiver. I would hold that a parental preinjury waiver is unenforceable under Michigan's common law because, absent special circumstances, a parent has no authority to bind his child by contract. I would further decline to change the common law rule.

While this Court unquestionably has the *authority* to modify the common law,[1] such modifications should be made with the utmost caution because it is difficult for the judiciary to assess the competing interests that may be at stake and the societal trade-offs relevant to one modification of the common law versus another in relation to the existing rule.

Ironically, defendant has consistently *denied* that the common law explicitly precluded use of parental preinjury waivers. As a result, defendant has never advocated a *specific* change in the common law, much less provided the Court with any analytic framework concerning such an alternative rule or any meaningful assessment of possible consequences that might attend a change in the existing rule. Particularly in light of the historic duration of the common law rule generally precluding parental waivers, and because the proponent requiring the change has essentially failed to provide any critical argument and analysis in support of the change, I would decline to alter the existing rule.[2]

---

[1] Const 1963, art 3, § 7 ("The common law and the statute laws now in force . . . shall remain in force until they expire by their own limitations, or are changed, amended or repealed."); *Longstreth v Gensel*; 423 Mich 675, 686; 377 NW2d 804 (1985) ("[T]he common-law rule remains the law until modified by this Court or the Legislature.").

[2] I note that a bill to modify the common law rule at issue here has been introduced in the Legislature. HB 4970, introduced May 19, 2009, would add § 5109 to the Estates and Protected Individuals Code. The added section would provide:

> (1) A parent or guardian of a minor who participates in recreational activity may release a person in advance from liability for economic or noneconomic damages for personal injury sustained by the minor as a result of the activity.

Accordingly, I would affirm the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.[3]

## I. FACTS AND PROCEDURAL HISTORY

The underlying facts are simple and likely familiar to many parents with young children. Five-year-old Trent Woodman's parents had his birthday party at Bounce Party, which defendant Kera LLC operates and which is an indoor play area that contains inflatable play equipment. Before the party, Trent's father, Jeffrey Woodman, signed a liability waiver on Trent's behalf. The waiver provided in pertinent part:

> (2) One or more of the following may be released from liability under this section:
>
> (a) A sponsor or organizer of the recreational activity.
>
> (b) An owner or lessee of the property on which the recreational activity occurs.
>
> (3) A release under this section shall be in writing signed by the parent or guardian.

On March 10, 2010, the House Judiciary Committee reported the bill with a substitute and recommended that the House of Representatives adopt the substitute.

[3] This is a case in which the competing policy interests are closely balanced. The common law and positive law that inform my understanding uniformly promote the protection of children and require that parents not be permitted to waive any future claims of their children. I am sympathetic to the arguments that Justice MARKMAN and the Court of Appeals concurrences offer that this view of the common law rule may promote litigiousness in our modern society. However, given the cases and positive law cited, I believe that this closely balanced social question is one best handled by the Legislature—particularly given that members of this Court, rather than the parties themselves, have offered stronger rationales for the common law rule that Justice MARKMAN favors.

3

THE UNDERSIGNED, by his/her signature herein affixed does acknowledge that any physical activities involve some element of personal risk and that, accordingly, in consideration for the undersigned waiving his/her claim against BOUNCE PARTY, and their agents, the undersigned will be allowed to participate in any of the physical activities.

By engaging in this activity, the undersigned acknowledges that he/she assumes the element of inherent risk, in consideration for being allowed to engage in the activity, agrees to indemnify and hold BOUNCE PARTY, and their agents, harmless from any liability for personal injury, property damage or wrongful death caused by participation in this activity. Further, the undersigned agrees to indemnify and hold BOUNCE PARTY, and their agents, harmless from any and all costs incurred including, but not limited to, actual attorney's fees that BOUNCE PARTY, and their agents, may suffer by an action or claim brought against it by anyone as a result of the undersigned's use of such facility.

Participant:_____ Signature:_____
       PRINTED NAME      Parent or Legal Guardian's
                               signature if participate [sic] is
                               under age 18.

Date: _____

BE SURE YOU COMPLETE THIS CARD AND SEND IT WITH THE PARTY GUEST!

Mr. Woodman signed the form as the parent and Trent's name was printed on the form as the "participant."[4]

During the party, Trent jumped off a slide and broke his leg. Trent, by his mother, Sheila Woodman, as next friend, filed suit against defendant, alleging negligence, gross

---

[4] As noted in footnote 6, given the language of the waiver, the fact that Mr. Woodman signed as "parent" rather than as the "participant" on the waiver raises questions about whether Trent's rights were waived at all.

negligence, and violation of the Michigan Consumer Protection Act (MCPA).[5]

Defendant sought summary disposition, arguing, in pertinent part, that plaintiff's claims were barred by the liability waiver. Plaintiff filed a cross-motion for summary disposition, arguing that the waiver was invalid as a matter of law because a parent cannot waive, release, or compromise his child's claims. The trial court ruled that the waiver barred plaintiff's negligence claim,[6] but not plaintiff's gross negligence or MCPA claims.

Plaintiff appealed the waiver issue, and defendant appealed the gross negligence and MCPA issues. The Court of Appeals reversed and held that the waiver was invalid to

---

[5] MCL 445.901 *et seq.*

[6] Ironically, the question whether the waiver at issue here actually bound the child was raised by members of this Court at oral argument, as the challenged waiver appears to bind only the "undersigned," who is Mr. Woodman, not the "participant," Trent. Indeed, it appears that the "undersigned" is bound to indemnify defendant for any liability that might occur. Notwithstanding this, plaintiff has argued throughout this litigation that the release *bound Trent*.

Following the trial court's determination that the waiver precluded plaintiff's suit, plaintiff subsequently moved for summary disposition and argued that the waiver language was ineffective to waive plaintiff's claim. Plaintiff conceded that the waiver "operate[d] between" defendant and Trent, but argued that the agreement was *insufficiently clear* to effectuate a valid waiver of Trent's rights. The trial court denied that motion, and plaintiff has not appealed *on the basis that the waiver language was ineffective*. An issue not advanced or appealed is deemed waived. *Lawrence v Will Darrah & Assoc Inc*, 445 Mich 1, 4 n 2; 516 NW2d 43 (1994). Because plaintiff never argued that the waiver bound Mr. Woodman, I do not address the obvious problems with the waiver language, which, in contradiction to the argument specifically advanced by plaintiff before the trial court, appears to bind only Mr. Woodman, rather than Trent.

5

bar the negligence claim.[7] The lead opinion, authored by Judge TALBOT, provided a thorough discussion of the validity of parental waivers in foreign jurisdictions as well as under Michigan law. The lead opinion concluded that under Michigan common law, "'a parent has no authority merely by virtue of the parental relation to waive, release, or compromise claims of his or her child.'"[8] Thus, the lead opinion concluded, "the release signed on behalf of [Trent] cannot be construed as valid"[9] and "the designation or imposition of any waiver exceptions is solely within the purview of the Legislature."[10] Judges BANDSTRA and SCHUETTE "reluctantly" concurred, noting their hope that this Court or the Legislature would address the issue and change the common law to permit a parent to waive the tort claims of their minor children.[11]

Defendant sought leave to appeal, and this Court granted defendant's application, limited to considering "whether the parental preinjury liability waiver was valid and enforceable."[12]

---

[7] *Woodman v Kera, LLC*, 280 Mich App 125; 760 NW2d 641(2008). The Court of Appeals also held that defendant was entitled to summary disposition on plaintiff's gross negligence and MCPA claims.

[8] *Id.* at 144 (opinion by TALBOT, J.), quoting *Tuer v Niedoliwka*, 92 Mich App 694, 698-699; 285 NW2d 424 (1979).

[9] *Woodman*, 280 Mich App at 151 (opinion by TALBOT, J.).

[10] *Id.* at 149.

[11] *Id.* at 157 (opinion by BANDSTRA, P.J.); *id.* at 161 (opinion by SCHUETTE, J.).

[12] *Woodman v Kera, LLC*, 483 Mich 999 (2009).

## II.  STANDARD OF REVIEW

This Court reviews de novo the grant or denial of summary disposition.[13]

## III.  DISCUSSION

Defendant seeks to have this Court enforce the parental preinjury waiver that Mr. Woodman signed on behalf of his son.  As stated, I believe that this Court must determine whether a parental preinjury waiver is enforceable under the common law and, if not, whether we should exercise our authority to change the common law and enforce such a waiver.

### A.  THE COMMON LAW

A parental preinjury waiver is a contract.  Mr. Woodman purportedly signed the contract on behalf of his son.  Consequently, defendant necessarily asserts that the contract is enforceable against Trent because Mr. Woodman had authority to bind his son to the contract.

The well-established Michigan common law rule is that a minor lacks the capacity to contract.[14]  It is undisputed that if five-year-old Trent had signed the waiver, defendant

---

[13] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

[14] See *Holmes v Rice*, 45 Mich 142; 7 NW 772 (1881) ("The law in recognizing the incapacity of infants to enter into certain contracts and declaring such contracts voidable does so for the infant's protection.  Their contracts are not void but voidable, and it is for the infant to avoid the contract or ratify it . . . ."); *Minock v Shortridge*, 21 Mich 304, 315 (1870) ("The executory contract of an infant, such as a promissory note, is not void in the sense of being a nullity, because it may be confirmed, but it has no binding force until it is confirmed."); *Carrell v Potter*, 23 Mich 377, 378-379 (1871); *Dunton v Brown*, 31 Mich 182, 183 (1875); *Reynolds v Garber-Buick Co*, 183 Mich 157, 162; 149 NW 985 (1914) ("After reaching his majority one may disaffirm a contract

---

7

could not enforce the waiver against him unless Trent confirmed it after he reached the age of majority.[15]

At issue is whether a minor can be bound by a contract signed on his behalf by a third party.[16] Specifically, can a parent bind his child by contract if the child could not

---

made by him during infancy and recover what he paid or parted with pursuant to such contract, if he return what he received."); *Lawrence v Baxter*, 275 Mich 587, 589; 267 NW 742 (1936) ("Authority need not be cited in support of the uniform holdings that a minor may rescind a contract of this character. The contract for the house and lot was not for a necessity.").

The common law exception to this rule is that a minor can bind himself by contract for "necessaries." See *In re Dzwonkiewicz's Estate*, 231 Mich 165, 167; 203 NW 671 (1925) (defining "necessaries" as items that "'answer[] the bodily needs of the infant, without which the individual cannot reasonably exist'" and holding that medical services are "necessaries") (citation omitted); *Squier v Hydliff*, 9 Mich 274, 277 (1861) ("It has, we believe, always been held that a minor might bind himself by contract for necessaries, and that such contract when executed, if reasonable under all the circumstances, or not so unreasonable as to be evidence of fraud or undue advantage, can not be repudiated by him."); *Lynch v Johnson*, 109 Mich 640, 643; 67 NW 908 (1896) ("These clothes were within the class known as 'necessaries.'"); *Wood v Losey*, 50 Mich 475, 477-478; 15 NW 557 (1883).

There are, of course, also express statutory exceptions to the common law. See, e.g., MCL 600.1404(2) (educational loans); MCL 600.1403 (willful misrepresentation of age); MCL 500.2205 (life or disability insurance); MCL 333.5127(1) (consent to medical care for a minor infected with venereal disease or HIV); MCL 333.6121(1) (consent to substance abuse related medical care); MCL 333.9132(1) (consent to prenatal and pregnancy related health care).

[15] See *Minock*, 21 Mich at 315. The age of majority in Michigan is 18. MCL 722.52.

[16] Justice MARKMAN cites numerous instances in which the Legislature has permitted "parents to provide consent to their children's participation in numerous significant activities" as a basis for concluding that parental preinjury waivers are enforceable. *Post* at 25, 27-30.

However, the issue presented in this case is *not* whether parents have the authority to consent to their child's participation in various activities. Certainly, parents generally

8

otherwise be bound?  Defendant insists that, under the common law, a parental waiver is enforceable to bar the claim of a minor child.  However, the Michigan common law rule is clear: a guardian, including a parent, cannot contractually bind his minor ward.[17]

That point of law was firmly established more than 130 years ago by this Court in *Armitage v Widoe*.[18]  In that case, the plaintiff was a minor when his father signed a land purchase contract on behalf of his son.  After reaching majority, the plaintiff sought to disaffirm the contract and recover the money his father had paid toward the purchase price on his behalf.  Justice COOLEY, writing for a unanimous Court, held that the plaintiff had no interest in the contract because his father was *without authority* to bind him to the contract:

> Had the infant in the first place undertaken to make another his agent to enter into the contract for him, the appointment would not have been

---

have such authority, and nothing in this opinion should be read as attempting to limit a parent's authority to provide consent to the *activity*. The issue in this case is whether a parent may bind his child by contract when the child is injured as a result of participating in the consented-to activity.

[17] See *Reynolds*, 183 Mich at 166, in which this Court stated:

> Of the power of guardians to contract for their wards, it is stated as a general proposition that:
>
> "Guardians cannot by their contracts bind either the person or estate of their wards.  Such contracts bind the guardians personally, and recovery must be had in an action against them, not against the ward." [Citation omitted.]

See also *Burt v McBain*, 29 Mich 260, 265 (1874) ("In this case the plaintiff was an infant, and she could not be bound by any relinquishment or attempted relinquishment by another of her rights."); *Bearinger v Pelton*, 78 Mich 109, 114; 43 NW 1042 (1889) ("The general guardian had no right to bind the infants by a consent decree.").

[18] *Armitage v Widoe*, 36 Mich 124 (1877).

valid. On the authorities no rule is clearer than that an infant cannot empower an agent or attorney to act for him. But if he cannot appoint an agent or attorney, it is clear he cannot affirm what one has assumed to do in his name as such. He cannot affirm what he could not authorize. It would be extraordinary if a party who has no power to do a particular act could yet do it indirectly by the mere act of adoption. Such a doctrine would deprive the infant wholly of his protection; for one has only to change the order of proceeding, assume to act for the infant first and get his authority afterwards, and the principle of law which denies him the power to give the authority is subverted. But such a doctrine is wholly inadmissible. The protection of infancy is a substantial one, and is not to be put aside and overcome by indirect methods.[19]

In *Lothrop v Duffield*,[20] an attorney who represented several infants in obtaining shares of their grandfather's estate sought to recover his fee from the minors' estates. This Court held that the attorney could not recover directly from the minors' estates because

> [w]hatever contract relations he had were with their guardian, *who could not bind the infants personally or their estate by contract* (except by authority of the probate court, in accordance with law), so as to subject their estates to claims filed by third parties for expenses incurred by the guardian.[21]

This Court set forth ample authority supporting the proposition that the guardian was without authority to bind the minors to a contract.[22]

The fact that the guardian in the instant case is the child's father does not alter this bedrock legal principle. Parents, as natural guardians of a child,[23] enjoy the same

---

[19] *Id.* at 129 (citations omitted).

[20] *Lothrop v Duffield*, 134 Mich 485; 96 NW 577 (1903).

[21] *Id.* at 487 (emphasis added).

[22] See *id.* at 487-489 and the numerous authorities cited therein.

authority over a child as legal guardians.[24] Indeed, in *Power v Harlow*,[25] Justice THOMAS M. COOLEY made clear that a parent's authority is limited to the care and custody of his child and that a parent is without authority to waive the rights of the child. In *Power*, the plaintiff child was injured while playing with an explosive on the defendant's property. The defense sought to use the mother's admission that the child had been warned of the danger as an admission binding on the child. The trial court held that the statement was inadmissible, and Justice COOLEY, writing for the Court, affirmed:

> The natural guardian has no power to admit away the rights of the ward whose person is committed to his custody. He is guardian of the person only, having no control of any estate the ward may possess, and could not be given a control except on judicial proceedings and after giving security for responsible care. This being so, it cannot be plausibly claimed that by an irresponsible admission he may deprive his ward of important rights. *A right of action is as much property as is a corporeal possession, and, in the case of a minor, is protected by the law in the same way and under the same securities. The mother could not release it even for full consideration and by the most formal instrument*; much less, therefore, could she, by mere word of mouth, when not under oath, or otherwise chargeable with responsibility, destroy his right of action by her admissions.[26]

---

[23] See *In re Knott*, 162 Mich 10, 16; 126 NW 1040 (1910); *In re Rosebush*, 195 Mich App 675, 686; 491 NW2d 633 (1992), quoting *In re LHR*, 253 Ga 439, 446; 321 SE2d 716 (1984).

[24] See *Gott v Culp*, 45 Mich 265, 271-272; 7 NW 767 (1881) ("The law is entirely well settled that the guardian's discretion in such matters stands on a very similar footing with a parent's, and that he is not compellable to prefer mere economy of cost to the welfare and comfort of his ward."); MCL 700.5215 ("A minor's guardian has the powers and responsibilities of a parent who is not deprived of custody of the parent's minor and unemancipated child . . . .").

[25] *Power v Harlow*, 57 Mich 107; 23 NW 606 (1885).

[26] *Id.* at 111 (emphasis added).

11

The longstanding and undisturbed common law rule that a parent lacks authority to bind his child by contract[27] was recently acknowledged by this Court in a case in which the Legislature had abrogated the general common law rule in the medical malpractice context. In *McKinstry v Valley Obstetrics-Gynecology Clinic, PC*,[28] the pregnant mother signed a medical waiver requiring arbitration of any claim on behalf of her unborn child. However, the mother contested the validity of that waiver after her child was injured during delivery. The Court considered the effect of MCL 600.5046(2) (since repealed by 1993 PA 78), which provided:

> A minor child shall be bound by a written agreement to arbitrate disputes, controversies, or issues upon the execution of an agreement on his behalf by a parent or legal guardian. The minor child may not subsequently disaffirm the agreement.

This Court concluded that the statute mandated that the arbitration agreement signed by the mother bind her child. In so doing, we acknowledged that the agreement would not have been binding under the general common law rule:

---

[27] See footnote 17 of this opinion; *Lothrup*, 134 Mich at 487; *Reliance Ins Co v Haney*, 54 Mich App 237, 242; 220 NW2d 728 (1974) ("A parent has no authority merely by virtue of the parental relation to waive, release, or compromise claims by or against his child."), citing 67 CJS, Parent & Child, § 58, p 764, and *Schofield v Spilker*, 37 Mich App 33; 194 NW2d 549 (1971); *Tuer*, 92 Mich App at 698-699 (holding that an agreement between parents purporting to release the father of child support obligation was not binding on the child); *In re Kinsella Estate*, 120 Mich App 199, 203; 327 NW2d 437 (1982) (mother's consent to annulment with putative father was not was not binding on children seeking to establish paternity); *Smith v YMCA of Benton Harbor/St Joseph*, 216 Mich App 552, 554; 550 NW2d 262 (1996) (parental release in exchange for $3,275 after child fell at swimming pool was not binding on child).

[28] *McKinstry v Valley Obstetrics-Gynecology Clinic, PC*, 428 Mich 167; 405 NW2d 88 (1987).

Our interpretation of [MCL 600.5046(2)] is a departure from the common-law rule that a parent has no authority to waive, release, or compromise claims by or against a child. However, the common law can be modified or abrogated by statute. Thus, a child can be bound by a parent's act when a statute grants that authority to a parent. We believe that [MCL 600.5046(2)] changes the common law to permit a parent to bind a child to an arbitration agreement.[29]

Accordingly, we reaffirmed that, under the consistent and well-established Michigan common law, a parent is without authority to bind his child by contract.

In support of its claim that parental preinjury waivers are valid, defendant first contends that general freedom of contract principles render these agreements enforceable.[30] This contention is entirely unpersuasive. The issue at hand is not whether a *competent adult* is free to contract. Rather, the relevant issue is the *subject matter* of the contract. This Court does not, under freedom of contract principles, enforce contracts that the parties otherwise have no authority to enter.[31] Mr. Woodman possesses no

---

[29] *Id.* at 192-193 (citations omitted).

[30] See *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002) ("'The general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.'"), quoting *Twin City Pipe Line Co v Harding Glass Co*, 283 US 353, 356; 51 S Ct 476; 75 L Ed 1112 (1931).

[31] See, e.g., *Atlas Mining Co v Johnston*, 23 Mich 36, 47 (1871) (holding that the defendant was not bound by its agent's agreement to purchase property sold at a public auction for $400 more than he was authorized to bid because "[i]t would be simply preposterous to hold that [the agreement] . . . assented to by [the agent], could in any way bind or affect the defendant, if [the agent] had no authority thus to bind them and the defendant did not ratify his action."); *Miller v Frost's Detroit Lumber & Wooden Ware Works*, 66 Mich 455, 458-459; 33 NW 406 (1887) (holding that the defendant was not bound by the agreement of an unauthorized agent to purchase lumber); *Deffenbaugh v Jackson Paper Mfg Co*, 120 Mich 242; 79 NW 197 (1899) (holding that the defendant

greater authority to waive the property rights of his son Trent than he possesses to waive the property rights of any other nonconsenting third party, such as his neighbor or a coworker. Thus, the answer to defendant's freedom of contract argument is simple: the freedom to contract does not permit contracting parties to impose obligations upon and waive the rights of third parties in the absence of legally cognizable authority to do so.

Relying on *O'Brien v Loeb*,[32] defendant's second contention is that a parent is only prohibited from waiving a tort claim *after* the injury and may freely waive a tort claim *before* the injury. In *O'Brien*, this Court rejected a parent's authority to waive her minor son's tort claim after the injury occurred because "[t]he transaction was carried on entirely with the mother, who was without authority to bind him in the release of his cause of action against the defendants."[33] Rather than supporting defendant's claim, *O'Brien* is in accord with the general common law rule that a parent is without authority to bind his child by contract. *O'Brien* in no way creates an exception to the general common law rule, and no limiting principle or rationale may be extracted from its

---

company was not bound by an employment contract with the plaintiff that its agents were not authorized to enter into on the defendant's behalf).

[32] *O'Brien v Loeb*, 229 Mich 405; 201 NW 488 (1924).

[33] *Id.* at 408. The Court further quoted the rule from 22 Cyc L & Proc at 584:

> "An infant is not bound by a contract made for him or in his name by another person purporting to act for him, unless such person has been duly appointed his guardian or next friend and authorized by the court to act and bind him." [*O'Brien*, 229 Mich at 408.]

holding. I conclude that there is no basis to support defendant's contention that a parent is only prohibited from waiving the child's tort claims after the injury.[34]

The application of the common law in this case is simple and straightforward. The waiver at issue is a contractual release. Mr. Woodman signed the waiver on behalf of his son, thereby intending to bind Trent to that contract. Under the common law, Mr. Woodman was without authority to do so. Accordingly, the waiver is not enforceable against Trent and does not bar his cause of action. Defendant's effort to enforce the waiver must therefore be viewed as a request that this Court modify the common law.

### B. SHOULD THE COMMON LAW BE CHANGED?

The Michigan Constitution provides that "[t]he common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."[35] Both this Court and the Legislature have authority to change the common law.[36]

In this case, we are (impliedly) asked to alter a common law doctrine that has existed undisturbed for well over a century. There is no question that, if this Court were inclined to alter the common law, we would be *creating* public policy for this state. Just as "legislative amendment of the common law is not lightly presumed,"[37] this Court does

---

[34] See *McKinstry*, 428 Mich at 192-193, in which this Court acknowledged that a *pre*injury arbitration agreement was not enforceable under the common law.

[35] Const 1963, art 3, § 7.

[36] *Myers v Genesee Co Auditor*, 375 Mich 1, 7; 133 NW2d 190 (1965).

[37] *Wold Architects & Engineers v Strat*, 474 Mich 223, 233; 713 NW2d 750 (2006).

15

not lightly exercise its authority to change the common law.[38]  Indeed, this Court has

acknowledged the prudential principle that we must "exercise caution and . . . defer to the

Legislature when called upon to make a new and potentially societally dislocating change

to the common law."[39]  Whether to alter the common law is a matter of prudence and,

because we share this authority with the Legislature, I believe we must consider whether

the prudent course is to take action where the Legislature has not.

## 1. THE SUPERIORITY OF THE LEGISLATURE TO MAKE POLICY DECISIONS

This Court has recognized that the Legislature is the superior institution for

creating the public policy of this state:

> "As a general rule, making social policy is a job for the Legislature, not the courts.  See *In re Kurzyniec Estate*, 207 Mich App 531, 543; 526 NW2d 191 (1994).  This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: 'The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's.'  *O'Donnell v State Farm Mut Automobile Ins Co*, 404 Mich 524, 542; 273 NW2d 829 (1979)."[40]

The superiority of the Legislature to address matters of public policy is positively

correlated with the complexity of the government's role in our society.  During the

nineteenth century, courts exercising their authority to alter the common law did so

---

[38] See *Bott v Natural Resources Comm*, 415 Mich 45; 327 NW2d 838 (1982).

[39] *Henry v Dow Chem Co*, 473 Mich 63, 89; 701 NW2d 684 (2005).

[40] *Van v Zahorik*, 460 Mich 320, 327; 597 NW2d 15 (1999), quoting *Van v Zahorik*, 227 Mich App 90, 95; 575 NW2d 566 (1997).

16

within the context of a simpler, agrarian economy. The legislatures of that era exercised a more limited regulatory role. In contrast, today's modern legislatures exercise robust regulation of all facets of our modern, internationalized economy and the rights and responsibilities of citizens. The need for a judiciary responsive to perceived public policy needs of the state has been correspondingly reduced by the development of the Legislature as a full-time institution and its pervasive statutory regulation of our increasingly complex society.

This case illustrates why this Court should frequently defer policy-based changes in the common law to the Legislature. When formulating public policy for this state, the Legislature possesses superior tools and means for gathering facts, data, and opinion and assessing the will of the public.[41] The Legislature can hold hearings, gather the opinions of experts, procure studies, and generally provide a forum for all societal factions to present their competing views on a particular question of public policy.

The judiciary, by contrast, is designed to accomplish the discrete task of resolving disputes, typically between two parties, each in pursuit of the party's own narrow interests. We are "'limited to one set of facts in each lawsuit, which is shaped and limited by arguments from opposing counsel who seek to advance purely private interests.'"[42] We do not generally consider the views of nonparties on questions of

---

[41] See *Henry*, 473 Mich at 92 n 24, quoting Schwartz & Lorber, *State Farm v Avery: State court regulation through litigation has gone too far*, 33 Conn L R 1215, 1219-1220 (2001).

[42] *Henry*, 473 Mich at 93 n 24, quoting Schwartz & Lorber, 33 Conn L R at 1220.

policy,[43] and we are limited to the record developed by the parties. The reality of our judicial institutional limitations is a significant liability in regard to our ability to make informed decisions when we are asked to create public policy by changing the common law.

This case demonstrates these institutional limitations. Defendant openly concedes that the principal impetus for seeking enforcement of parental preinjury waivers is the protection that waivers afford its business in the face of the increasingly litigious nature of society. But for the perceived increased likelihood of a lawsuit and accompanying litigation costs, businesses such as defendant would not need parental preinjury waivers.[44] Accordingly, in seeking to have its waiver enforced, defendant requires a modification of the common law rule and thus necessarily (but only impliedly) asserts that the societal benefits of enforcing the waiver—saving defendant litigation costs—

---

[43] Our authority to entertain the positions of nonparties through briefs of amici curiae, MCR 7.306(D), is a far inferior alternative to the legislative process, in which hearings on policy questions broadly permit all citizens to give testimony and otherwise participate by petitioning their government and lobbying their representatives. See Const 1963, art 1, § 3. While appropriate in the legislative branch, such conduct is unethical in the judicial branch.

This very case shows the limit of this Court's ability to consider positions other than the ones advanced by the parties. Although the question whether parents may waive their children's rights is one of obvious public policy significance, only two amicus curiae briefs were submitted, and one urged this Court to defer to the Legislature. See amicus curiae brief of the Michigan Association for Justice at 7.

[44] Judge BANDSTRA, concurring with the lead opinion in the Court of Appeals, observed that "this case amply demonstrates [that] ours is an extremely and increasingly litigious society" and that "[c]hildren have routinely jumped off playground slides for generations; lawsuits seeking to impose damages on someone else for resulting injuries are only a recent phenomenon." *Woodman*, 280 Mich App at 160 & n 2.

18

outweigh the societal costs of abrogating the common law. Defendant, however, has not provided this Court with anything beyond mere conjecture that this is true.[45]

This is a purely policy-driven matter with numerous costs, benefits, and trade-offs—none of which defendant has bothered to raise, much less explicate. Certainly, enforcing the common law would protect minors' contractual and property rights and presumably encourage greater care in preventing negligent injuries to children. These are, without question, admirable societal goals with significant societal benefits that have a long provenance in this state's jurisprudence. Changing the common law would arguably save litigation costs for businesses offering recreational activities for children and concomitantly promote the availability of a wide range of activities for children. These too are admirable societal goals.[46] Of concern, however, are the potential hidden costs that might occur if the common law were changed. For example, if parental preinjury waivers were to be enforced, there would be a possibility that business owners will have diminished incentives to maintain their property appropriately, resulting in an

---

[45] Again, defendant does not even acknowledge that it seeks to change the common law rule. Consequently, defendant offers no analysis of what change this Court should make to the existing rule or the consequences of such a change.

[46] Fostering the stability of Michigan's businesses is also an important policy objective. In fact, given Michigan's persistently poorly performing economy, an argument could be made that fostering businesses that create more job opportunities is of primary social and economic importance to this state. See Gallagher, *CEOs expect slow state recovery*, Detroit Free Press, October 28, 2009, at 13A; *The State of Joblessness*, Wall St J, October 20, 2009, at A20; United States Department of Commerce, Bureau of Economic Analysis, *News Release: Economic Slowdown Widespread Among States in 2008*, June 2, 2009 (showing that Michigan's gross domestic product has declined each year since 2005), available at <http://www.bea.gov/newsreleases/regional/gdp_state/2009/pdf/gsp0609.pdf> (accessed June 3, 2010).

increased number of injuries to children. Moreover, the enforcement of preinjury waivers might result in an increased burden on taxpayers for children whose parents waived their children's right to pursue a tort remedy but cannot afford their necessary medical care.[47]

These are but two illustrations of possible unintended consequences that a change in the common law here might occasion. Undoubtedly, there are many others. How are we as jurists to determine whether enforcing or changing the common law rule will result in a net benefit to society? Here we would only be able to make an uneducated guess without even a substantial analysis from the party that requires (but has not asked for) changes in the common law.[48] When engaging in such rank guesswork, the weight of common law authority that has existed for more than a century must be preferred. In accord with Hippocrates' admonition, maintaining the status quo has the significant benefit of doing no greater harm.

As stated previously, the Legislature is not similarly constrained to make policy on the basis of blind speculation. Thus, if changing the common law to permit a parent to bind his child to a preinjury waiver is deemed to result in a net societal benefit, the Legislature can determine that fact with reasonable assurance before subjecting the public to such a change.

---

[47] See *Kirton v Fields*, 997 So 2d 349, 357 (Fla, 2008). ("If the parent cannot afford to bear that burden, the parties who suffer are the child, other family members, and the people of the State who will be called on to bear that financial burden.").

[48] Cf. *Henry*, 473 Mich at 90 ("In effect, we have been asked to craft public policy in the dark.").

Illustratively, defendant's proffered rationale for a revision of what a majority of justices have concluded is the existing rule is the argument that a parent is presumed to act in his child's best interests and has a "fundamental right . . . to make decisions pertaining to the care, custody, and control of [that] minor child[]."[49] That rationale, however, is not discretely limited to preinjury waivers. Under defendant's proffered analysis, a parent would be able to bind the child in *any* contract, no matter how detrimental to the child. Thus, defendant's rationale would arguably completely abrogate the common law prohibition of guardians contractually binding their minor wards.

As explained, the common law rules regarding minors and limitations on those who would contract on their behalf exist solely for the protection of the minors.[50] As unfortunate as it may be, a parent does not always act in his child's best interests. For example, in *Wood v Truax*,[51] the defendant's guardian entered into a mortgage and bond when the defendant was a minor. After the mortgage went into foreclosure, the plaintiff "procured a decree for the deficiency" against the defendant. However, *Wood* applied the common law rules to invalidate a judgment against the defendant because the mortgage was entered into when she was a minor and she had done nothing to affirm the contract

---

[49] *Troxel v Granville*, 530 US 57, 66; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (opinion by O'Connor, J.); see also *Parham v J R*, 442 US 584, 602; 99 S Ct 2493; 61 L Ed 2d 101 (1979).

[50] See *Holmes*, 45 Mich at 142 ("The law in recognizing the incapacity of infants to enter into certain contracts and declaring such contracts voidable does so for the infant's protection.").

[51] *Wood v Truax*, 39 Mich 628 (1878).

after reaching adulthood.[52]  Similarly, in *Tuer v Niedoliwka*,[53] the mother agreed on her infant child's behalf to release the father from all child support obligations in return for $2,000.  However, the Court held that a "child's right to support from a putative father cannot be contracted away by its mother, and that any release or compromise executed by the mother is invalid to the extent that it purports to affect the rights of the child."[54] Thus, as noted in our caselaw, there have been instances in which a parent did not act in his child's best interests, and it is certainly not unimaginable that such agreements could recur and be enforced in the absence of the common law rule that serves to protect the minor child.

As occurred in oral argument on this case, those favoring the modification of the common law rule might reflexively respond to the fact that parents do not always act in the best interests of their children by adding a qualifier to the modification of the common law rule: a parental waiver is binding on the child only if the waiver is in the "*child's best interests*."  However, this effort to avoid eviscerating the protection of children now recognized in the common law rule would undoubtedly create as many problems as it would resolve.  Certainly, such an approach would create ancillary litigation over whether the parental waiver was in the child's best interests.  While society might generally benefit from allowance of parental waivers for minor children, it could reasonably be asked: Is *any* preinjury waiver that is later asserted against a

---

[52] *Id.* at 633.

[53] *Tuer*, 92 Mich App at 696.

[54] *Id.* at 699.

particular minor *ever* in the best interests of the *injured child*?  The existing common law is well established, clear, and easy to apply and consistently protects children; it must be preferred over a chaotic, ad hoc alternative.

## 2.  PUBLIC POLICY ENACTED BY THIS COURT MUST BE CONSISTENT WITH THE EXISTING PUBLIC POLICY OF THIS STATE

For the reasons discussed in the preceding section, this Court must practice restraint when considering a change in the common law.  I believe we must limit the exercise of our authority by creating public policy that is consistent with the existing public policy of this state.  Doing so protects against unwarranted and unwanted "societally dislocating change[s]" to the public policy of this state.[55]  We have previously defined the proper sources of public policy to guide our analysis:

> In identifying the boundaries of public policy, we believe that the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law.[56]

### a.  POSITIVE LAW

The preferred practice is to follow the lead of the institution best suited to make public policy for the state.  Accordingly, I begin with the positive law enacted by the Legislature to determine whether public policy supports the change in the common law sought by defendant.

---

[55] *Henry*, 473 Mich at 89.

[56] *Terrien*, 467 Mich at 66-67.

The Legislature has affirmatively acted to protect and preserve minors' property interests.[57] With respect to a minor's cause of action, the Legislature has taken two significant steps. Pursuant to MCL 600.5851, the minority tolling provision, the period of limitations for a cause of action that accrued during minority is tolled. The minor is permitted to bring his cause of action within one year of reaching majority.[58] Thus, the Legislature has acted to preserve a minor's ability to pursue and control the minor's own claim.

Furthermore, although a parent as next friend of his child may settle a claim with the approval of the court,[59] the parent's authority to receive settlement proceeds on the child's behalf is strictly limited. Under MCL 700.5102, a guardian or person with the

---

[57] See, e.g., MCL 700.5401(2) (permitting a court to appoint a conservator or enter a protective order "if the court determines that the minor owns money or property that requires management or protection that cannot otherwise be provided, has or may have business affairs that may be jeopardized or prevented by minority, or needs money for support and education and that protection is necessary or desirable to obtain or provide money"); Michigan Uniform Transfers to Minors Act, MCL 554.521 *et seq.*

[58] MCL 600.5851 contains exceptions for medical malpractice claims, but provides in pertinent part:

> [I]f the person first entitled to make an entry or bring an action under this act is under 18 years of age . . . at the time the claim accrues, the person or those claiming under the person shall have 1 year after the disability is removed through death or otherwise, to make the entry or bring the action although the period of limitations has run. [MCL 600.5851(1).]

[59] MCR 2.420; *O'Brien*, 229 Mich at 408.

24

care and custody of a minor may receive no more than $5,000 each year on that minor's behalf,[60] and

> an individual receiving money or property for a minor is obligated to apply the money to the minor's support and education, but shall not pay himself or herself except by way of reimbursement for out-of-pocket expenses for goods and services necessary for the minor's support. An excess amount shall be preserved for the minor's future support and education. A balance not used for those purposes and property received for the minor shall be turned over to the minor when majority is attained.[61]

Notably, the Court of Appeals has held that MCL 700.5102 does not authorize a parent to *settle* his child's tort claims.[62] Furthermore, in recognizing these legislative policy choices, this Court has provided by court rule that all settlements in favor of minors for payments of less than $5,000 in a single year are controlled by MCL 700.5102 and all greater settlements require the appointment of a conservator.[63]

These statutes evince a public policy firmly at odds with the autonomous parental control over a minor's property rights that defendant asserts. The Legislature has consistently acted to preserve a minor's property interest in his tort claims, and nothing in Michigan's positive law indicates a legislative intent to abrogate the common law or

---

[60] MCL 700.5102(1)(b) and (c).

[61] MCL 700.5102(3).

[62] *Smith*, 216 Mich App at 555 ("The statute does not provide parents the authority to compromise their children's claims; it merely permits a debtor of a minor to make payments directly to the minor's parents without seeking judicial approval for each payment as long as the aggregate amount of the payments is less than $5,000 a year."). *Smith* interpreted MCL 700.403, a predecessor of MCL 700.5102 with essentially the same provisions.

[63] MCR 2.420(B)(4); see MCL 700.5401 through MCL 700.5433 (providing for the appointment of a conservator to protect the property of a minor).

extend a parent's authority. Accordingly, positive law does not provide an anchor for altering the common law rules.

## b. COMMON LAW

The common law is also a valid source for identifying the public policy of this state.[64] If the change required by defendant in order to have the parental waiver upheld were consistent with other common law doctrines, this Court could consider creating consistent public policy. Here, however, the change necessitated to validate the parental waiver is at odds with other pertinent common law doctrines.

Defendant, in seeking to enforce a parental right to bind his child by contract, requires the abrogation of not one, but two common law tenets. First, as stated, a minor lacks the capacity to contract: "Their contracts are not void but voidable, and it is for the [minor] to avoid the contract or ratify it . . . ."[65] Second, a guardian cannot contractually bind his minor ward.

It should be noted that the modification defendant requires would not merely give a parent the *same* authority as the minor, given that a minor has no contractual authority and the minor's waiver would not bar this action. Rather, defendant requires a modification of the common law rule that would give the parent authority to contractually bind the minor *superior* to that the minor *himself* enjoys. In short, defendant requires that the common law be changed to permit a parent to do what a minor could not do on his

---

[64] See *Terrien*, 467 Mich at 66-67.

[65] *Holmes*, 45 Mich at 142.

26

own behalf—enter into a contract that binds the minor. As we have previously stated, the rule that a minor lacks capacity to contract exists solely for the minor's protection.[66] "The protection of infancy is a substantial one, and is not to be put aside and overcome by indirect methods."[67] The exception required by defendant does precisely that: it removes the protections of a minor's incapacity to contract by the indirect means of permitting the guardian to enter into a binding and enforceable contract for the minor.

Moreover, under the common law, minors are generally protected by the placement of greater burdens and increased potential liability on those coming into contact with minors. Thus, permitting the waiver of liability for negligent harm done to a child is inconsistent with public policy broadly recognized in the common law.

For example, a landowner is generally not liable for injuries suffered by a trespasser,[68] but the attractive nuisance doctrine imposes liability for injuries suffered by trespassing children.[69] Thus, the common law doctrine protects children by imposing *greater* liability on landowners when minors are involved.[70] Also, under the common

---

[66] *Id.*

[67] *Armitage*, 36 Mich at 129.

[68] The exception is for injuries caused by the landowner's willful and wanton misconduct. *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 596; 614 NW2d 88 (2000).

[69] *Murday v Bales Trucking, Inc*, 165 Mich App 747, 751-752; 419 NW2d 451 (1988); 2 Restatement Torts, 2d, § 339, p 197.

[70] See Justice COOLEY writing for the Court in *Powers v Harlow*, 53 Mich 507, 515; 19 NW 257 (1884):

law, a minor under seven years old was incapable of contributory negligence.[71]   For minors older than seven, contributory negligence was based on "whether the child had conducted himself as a child of his age, ability, intelligence and experience would reasonably have been expected to do under like circumstances."[72]   Accordingly, the common law protects children by creating an incentive to exercise *greater* care for minors because it *limits* a defendant's ability to escape liability on the basis of the child's contributory negligence.[73]

The public policy of this state reflected in these common law liability doctrines is to protect children by imposing *greater liability* on adults for conduct involving potential harm to children.  It would therefore require an extremely compelling argument to change

---

Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly.  If they leave exposed to the observation of children anything which would be tempting to them, and which they in their immature judgment might naturally suppose they were at liberty to handle or play with, they should expect that liberty to be taken.

[71] *Baker v Alt*, 374 Mich 492, 505; 132 NW2d 614 (1965).

[72] *Burhans v Witbeck*, 375 Mich 253, 255; 134 NW2d 225 (1965); see also 2 Restatement Torts, 2d, § 283A, p 14.

[73] See *Tyler v Weed*, 285 Mich 460, 488-489; 280 NW 827 (1938) (MCALLISTER, J., dissenting in part) ("This ancient bulwark and protection of little children is a vital safeguard of their rights and persons. It warns that no one can negligently cause injury to a child of such tender years with impunity, by casting on his small shoulders the onerous burden of proving his own freedom from negligence.").

the common law and permit defendant to *limit* its liability involving children.[74] Defendant has offered none.

## IV. CONCLUSION

The relief impliedly sought by defendant requires the creation of a new public policy for this state by modification of the common law. Although this Court has the authority to create public policy through its management of the common law, we share that authority with the Legislature. This Court has fewer tools for assessing the societal costs and benefits of changing the common law than the Legislature, which is designed to make changes in public policy and the common law. Moreover, defendant has failed to identify *any* existing public policy supporting the change in the common law that it seeks; the existing positive law and common law indicate that enforcing parental waivers is contrary to the established public policy of this state. Accordingly, in matters such as these, I am persuaded that the prudent practice for this Court is conservancy of the common law.

Accordingly, I would decline to change the common law. I would affirm the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

Robert P. Young, Jr.

---

[74] I note that, even without a change in the common law rule, defendant has alternatives for reducing its liability. For example, defendant's waiver in this case suggests a suitable, although perhaps less than optimal, alternative: parental indemnity. A parent can contract on the parent's own behalf to indemnify the defendant for any losses arising from injuries his child suffers while participating in the activity offered by the defendant.

STATE OF MICHIGAN

SUPREME COURT

TRENT WOODMAN, a Minor, by his Next
Friend, SHEILA WOODMAN,

       Plaintiff-Appellee,

v                                    No. 137347

KERA LLC, doing business as BOUNCE
PARTY,

       Defendant-Appellant.

_____

HATHAWAY, J.

I concur with the result reached in Justice YOUNG's opinion, that a preinjury waiver signed by a parent on behalf of his or her minor child is unenforceable under longstanding Michigan law, for the reasons stated in parts I, II, and III(A) of the opinion. This rule has been embodied in Michigan law for more than a century, and I find no compelling reason to depart from it now.

The public policy concerns expressed by the concurring opinions in the Court of Appeals presume that such waivers have been enforceable in the past and that if we suddenly stop enforcing them, children's sports programs and activities and the businesses that run them will somehow be fundamentally undermined. However, the fact is that preinjury waivers have never been enforced or considered enforceable by the

courts of this state.[1] Despite the fact that Michigan does not enforce these waivers, children still play football, engage in sports activities, and go to bounce parties, just as they do in other states that do not enforce preinjury waivers.[2]

As noted in the remainder of Justice YOUNG's opinion, there are compelling public policy reasons not to depart from this historic rule.[3] The purpose of the rule is to protect minor children. The rule merely provides the same protections for minor children in their preinjury status as in their postinjury status. The protections afforded injured minor children seeking redress have long been embodied in our court rules, see MCR 2.420, as well as in our probate codes, see, e.g., MCL 700.5102, a provision of the

---

[1] Please see the analysis contained in parts I, II, and III(A) of Justice YOUNG's opinion.

[2] See, e.g., *Williams v United States*, 660 F Supp 699 (ED Ark, 1987); Hawaii Rev Stat 663-10.95 and 663-1.54 (2006); *Leong v Kaiser Foundation Hosps*, 71 Hawaii 240; 788 P2d 164 (1990); *Douglass v Pflueger Hawaii, Inc*, 110 Hawaii 520; 135 P3d 129 (2006); *Meyer v Naperville Manner, Inc*, 262 Ill App 3d 141; 634 NE2d 411 (1994); *Wreglesworth v Arctco, Inc*, 316 Ill App 3d 1023; 738 NE2d 964 (2000); La Civ Code art 2004 (2006); *Costanza v Allstate Ins Co*, 2002 US Dist LEXIS 21991 (ED La, 2002); *Rice v American Skiing Co*, 2000 Me Super LEXIS 90 (Me Super Ct, 2000); *Hojnowski v Vans Skate Park*, 187 NJ Super 323; 901 A2d 381 (2006); *Childress v Madison Co*, 777 SW2d 1 (Tenn Ct App, 1989); *Munoz v II Jaz Inc*, 863 SW2d 207 (Tx App, 1993); *Fleetwood Enterprises, Inc v Gaskamp*, 280 F3d 1069 (CA 5, 2002); *Hawkins v Peart*, 37 P3d 1062 (Utah, 2001); *Hiett v Lake Barcroft Community Ass'n, Inc*, 244 Va 191; 418 SE2d 894 (1992); *Scott v Pacific West Mountain Resort*, 119 Wash 2d 484; 834 P2d 6 (1992); *Johnson v New River Scenic Whitewater Tours, Inc*, 313 F Supp 2d 621 (SD W Va, 2004).

[3] While I agree with the well-articulated public policy reasons expressed by Justice YOUNG, I do not join in Justice YOUNG's assertion that the rule prohibiting parental waivers can be circumvented by a parental indemnity agreement. This issue is not before the Court, and the assertion would be, at best, dicta. More importantly, if it had been an issue here, it should be recognized that a parental indemnity agreement would directly contravene the compelling policy reasons that exist for the historic rule.

Estates and Protected Individuals Code. There is no question that a parent may not resolve his or her child's claim or sign a release on the child's behalf without court approval after the child has been injured, and there simply is no justifiable reason to treat preinjury releases any differently. The historic rule is a sensible, logical, and well-reasoned approach that places greater emphasis on the protection of minor children than on hypothetical business concerns that have not materialized in this or any other state that has chosen to follow it.

KELLY, C.J., and WEAVER, J., concurred with HATHAWAY, J.

STATE OF MICHIGAN

SUPREME COURT

TRENT WOODMAN, a Minor, by his Next
Friend, SHEILA WOODMAN,

       Plaintiff-Appellee,

v                                    No. 137347

KERA LLC, doing business as BOUNCE
PARTY,

       Defendant-Appellant.

_____

KELLY, C.J.

I concur in full with Justice HATHAWAY and with parts I, II, and III(A) of Justice YOUNG's opinion. I write separately to touch on parental indemnity agreements in the context of liability waivers involving children. Justice YOUNG takes the position that a defendant can circumvent the unenforceability of a parental preinjury liability waiver simply by entering into a separate indemnity agreement with the parent. In footnote 74 of his opinion, he states:

> I note that, even without a change in the common law rule, defendant has alternatives for reducing its liability. For example, defendant's waiver in this case suggests a suitable, although perhaps less than optimal, alternative: parental indemnity. A parent can contract on the parent's own behalf to indemnify the defendant for any losses arising from injuries his child suffers while participating in the activity offered by the defendant.

Justice YOUNG is the only one who has advanced this position and it has not been adopted by this Court. I find his proposition problematic for several reasons.

First, his discussion of the issue is unnecessary to resolve the case. Second, neither of the parties advanced this argument, and this Court did not have a proper opportunity to consider and pass on it. I would be hesitant to make such a sweeping holding without having briefing on the matter. Also, the Court has not given due consideration to how indemnity agreements by parents interact with parental preinjury liability waivers.

Finally, the validity of such indemnity agreements is questionable. They would require an injured child to seek recovery from his or her parent. Courts in a number of states have held that such indemnity agreements are unenforceable because they produce the same effect as parental preinjury liability waivers. That is, they enable a tortfeasor who is negligent to shift financial responsibility for its tortious conduct to the parent of the minor victim.[1]

The validity of such indemnity agreements is not answered in this case and is left for another day.

Marilyn Kelly

---

[1] See, e.g., *Johnson v New River Scenic Whitewater Tours, Inc*, 313 F Supp 2d 621 (SD W Va, 2004) (holding that an indemnity agreement with defendant whitewater rafting company was unenforceable and against public policy).

STATE OF MICHIGAN

SUPREME COURT

TRENT WOODMAN, a Minor, by his Next
Friend, SHEILA WOODMAN,

        Plaintiff-Appellee,

v                                          No. 137347

KERA LLC, doing business as BOUNCE
PARTY,

        Defendant-Appellant.

_____

CAVANAGH, J.

I would affirm the Court of Appeals' decision that defendant was not entitled to summary disposition on the basis of the release. I would do so, however, on different grounds. The actual language of the release at issue did not waive the minor child's claims. Instead, the release only waived the claims of the "undersigned," and the undersigned was the child's father. Although I believe that whether a parental preinjury liability waiver is valid and enforceable is an issue of jurisprudential significance, I find it unnecessary to reach that issue in this case.[1] Accordingly, I would vacate the portion of the judgment of the Court of Appeals that held that preinjury waivers effectuated by

_____

[1] For the reasons stated in Chief Justice KELLY's opinion, I would also find it unnecessary to address whether a defendant could circumvent a parental preinjury liability waiver by entering into a separate indemnity agreement with a parent.

parents on behalf of their minor children are not presumptively enforceable, and I would remand the case to the trial court for further proceedings.

Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

TRENT WOODMAN, a Minor, by his Next
Friend, SHEILA WOODMAN,

        Plaintiff-Appellee,

v                                      No. 137347

KERA LLC, doing business as BOUNCE
PARTY,

        Defendant-Appellant.

_____

MARKMAN, J.

I agree that defendant was not entitled to summary disposition on the grounds that the actual language of the waiver at issue did not waive the minor's claims. Accordingly, I would affirm the judgment of the Court of Appeals. However, I would vacate the analysis that concluded that a parent cannot waive a child's negligence claim prospectively in order to participate in voluntary recreational activities. In that regard, the Court of Appeals answered a question that was not properly before it given the actual terms of the release. The lead opinion and those of Justice HATHAWAY and Chief Justice KELLY do the same. Therefore, I disagree with this conclusion of law. If this issue were properly before us-- and it is not-- I would clarify that Michigan's common law *does* allow the enforcement of such a waiver. That is, if the release in this case had actually contained effective language indicating that the father was waiving his son's negligence claims prospectively, I would conclude that Michigan common law permits the

enforcement of that waiver to the same extent as if the father himself had signed a preinjury waiver of his own rights as a condition of participating in a sporting or recreational activity.[1]

## I. THE RELEASE

As recognized in the lead opinion, Jeffrey Woodman signed a form so that his son could participate in a recreational activity. The pertinent part of the release, which only the father signed, provided:

> THE UNDERSIGNED, by his/her signature herein affixed does acknowledge that any physical activities involve some element of personal risk and that, accordingly, in consideration for the undersigned waiving his/her claim against BOUNCE PARTY, and their agents, the undersigned will be allowed to participate in any of the physical activities.

Thus, the release stated plainly that the "undersigned" (who was the father), in consideration for waiving his claim against defendant, would be allowed to participate in

---

[1] Our caselaw is replete with instances in which waivers signed by adults have been enforced. See, e.g., *Kircos v Goodyear Tire & Rubber Co*, 108 Mich App 781; 311 NW2d 139 (1981) (pit crew members could not recover from a sports car club for their injuries because they had signed an applicable waiver); *Paterek v 6600 Ltd*, 186 Mich App 445; 465 NW2d 342 (1990) (softball field owner's agreement to let a player play softball on its field was adequate consideration to support the player's release of the owner from liability); *Dombrowski v City of Omer*, 199 Mich App 705; 502 NW2d 707 (1993) (release executed by a contestant in a "rope climb" across a river was not subject to rescission on the ground of mutual mistake as a result of the contestant's signing it without reading it, absent any allegation of misrepresentation); *Skotak v Vic Tanny Int'l, Inc*, 203 Mich App 616, 617-618; 513 NW2d 428 (1994) ("It is not contrary to this state's public policy for a party to contract against liability for damages caused by its own ordinary negligence."); and *Lamp v Reynolds*, 249 Mich App 591, 594; 645 NW2d 311 (2002) ("[A]lthough a party may contract against liability for harm caused by his ordinary negligence, a party may not insulate himself against liability for gross negligence or wilful and wanton misconduct.").

2

any of defendant's physical activities, which involved some element of personal risk. While the child was identified as a "participant" at the bottom of the release, the only waiver that actually occurred was by and for the "undersigned," the father. Thus, the actual language of the release simply did not waive any claims or rights of the minor, whatever was purported to have been done and whatever issues the parties have determined to litigate.

Remarkably, the justices comprising the majority do not see this as a barrier to their opinions. Rather, they decide that *if* the document had been drafted to state that the father was waiving his son's potential claims-- which again it was not-- it would have been unenforceable. This is a noteworthy pronouncement of law, but over the past 175 years or so, this Court has been in the habit of uttering such pronouncements only in response to actual and not hypothetical disputes. We have been in the habit of viewing an actual dispute as a condition for the exercise of our "judicial power." Const 1963, art 6, § 1. To decide a hypothetical dispute is the equivalent of issuing an advisory opinion, which, with narrow constitutional exceptions, is beyond the scope of this judicial power.[2]

In effect, the justices in the majority assert the invalidity of a contract into which the parties never entered. This constitutes nothing less than reaching out to decide a non-controversy-- indeed, in this case, a false controversy. The opinions of the justices in the

---

[2] Const 1963, art 3, § 8, authorizes this Court to issue advisory opinions concerning the constitutionality of legislation, but only upon the request of either house of the Legislature or the Governor and only after it has been enacted into law but not yet taken effect.

3

majority, whatever their substantive merits, constitute little more than nonbinding dicta and more properly belong in a law review rather than a volume of the Michigan Reports.

The lead opinion suggests that plaintiff "abandoned" or "waived" the argument that the release did not actually waive the son's claims because, although plaintiff preserved this issue in the trial court, he did not preserve it in the Court of Appeals. While I certainly agree that an appellate court will not ordinarily review an issue that has been abandoned or waived, such review is allowed when it is "necessary to a proper determination of the case . . . ." *Dation v Ford Motor Co*, 314 Mich 152, 160-161; 22 NW2d 252 (1946); see also *Paramount Pictures Corp v Miskinis*, 418 Mich 708, 731; 344 NW2d 788 (1984); *Prudential Ins Co of America v Cusick*, 369 Mich 269, 290; 120 NW2d 1 (1963).[3] This could not be more clearly the situation here. The individual decision of a litigant not to pursue an available argument, or to relinquish an available issue, cannot impose on this Court an obligation to operate upon a false premise, in this case that a contract says what it clearly does not say.[4] That is, neither an individual

---

[3] See also MCR 7.316(A)(3), providing that this Court may "permit the reasons or grounds of appeal to be amended." If ever there was a circumstance compelling the application of this rule, it is here.

[4] See, e.g., *Mack v Detroit*, 467 Mich 186, 197; 649 NW2d 47 (2002), in which the defendant "city abandoned its assertion of governmental immunity to this Court," yet this Court nevertheless held that the city was entitled to prevail because of governmental immunity. As this Court explained:

> [A]ddressing a controlling legal issue despite the failure of the parties to properly frame the issue is a well understood judicial principle. See *Legal Services Corp v Velazquez*, 531 US 533, 549, 558; 121 S Ct 1043; 149 L Ed 2d 63 (2001) (majority and dissent both stating that whether to address an issue not briefed or contested by the parties is left to

4

litigant nor even both litigants acting jointly can require this Court to turn a blind eye toward the actual words of a dispositive document. No matter what the parties' determination to have a particular issue decided, they cannot impose on this Court the obligation to pretend that A does not say A; no litigant can obligate this Court to ignore what is true and accept what is false.

Thus, in deciding whether a parent can waive a child's claims before the injury, the justices in the majority are compelled to rewrite what is a straightforward release. However, the proper rule is that the scope of a release is controlled by its *language*, and we construe such language as written. See *Batshon v Mar-Que Gen Contractors, Inc*, 463 Mich 646, 649-650; 624 NW2d 903 (2001); *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197-198; 747 NW2d 811 (2008). The justices in the majority construe the release not "as written," but as rewritten.

For these reasons, I would affirm the judgment of the Court of Appeals that held that defendant was not entitled to summary disposition, but I would vacate the Court of Appeals' analysis addressing a parent's ability to waive a child's negligence claims prospectively. I thus dissent from the decision to rewrite a contract in order to answer a question not raised by the actual contract.

---

discretion of the Court); *Seattle v McCready*, 123 Wash 2d 260, 269; 868 P2d 134 (1994) (indicating that the court "is not constrained by the issues as framed by the parties"). [*Id.* at 207-208.]

## II. THE COMMON LAW

## A. NATURE OF THE COMMON LAW

The common law originated in the decisions of English judges, starting in the early Middle Ages, and developed over the ensuing centuries. Hall, ed, *The Oxford Companion to American Law*, (New York: Oxford University Press, 2002), p 125. Sir Edward Coke explained that the common law was the "custom of the realm." Coke, *The Complete Copyholder*, p 70 (1641). He indicated that if a custom was "current throughout the commonwealth," it was a part of the common law. *Id.* Sir William Blackstone similarly discussed "[g]eneral customs; which are the universal rule of the whole kingdom, and form the common law." 1 Blackstone, Commentaries on the Laws of England, p 67.

The "common law and its institutions were systemically extended to America, at least insofar as appropriate for frontier conditions." *Oxford Companion*, p 127. This was true in particular in Michigan where each of its constitutions (starting in 1835) generally adopted the common law.[5] Given that the common law develops through judicial decisions, it has been described as "judge-made law." *Placek v Sterling Hts*, 405 Mich 638, 657; 275 NW2d 511 (1979). As this Court explained in *Bugbee v Fowle*, the

---

[5] See Const 1835, Schedule, § 2; *Stout v Keyes*, 2 Doug 184, 188-189 (Mich, 1845), Const 1850, Schedule, § 1, Const 1908, Schedule, § 1, and Const 1963, art 3, § 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed"). As noted in *Bean v McFarland*, 280 Mich 19, 21; 273 NW 332 (1937), "the retention of the common law [in the constitution] is expressly conditioned upon right to abrogate the same or any part thereof." Thus, whenever the Legislature enacts a statute that is inconsistent with the common law, the statute supersedes the common-law rule. Positive law trumps common law.

common law "'is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes.'" *Bugbee v Fowle*, 277 Mich 485, 492; 269 NW 570 (1936), quoting *Kansas v Colorado*, 206 US 46, 97; 27 S Ct 655; 51 L Ed 956 (1907).

The common law, however, is not static. By its nature, it adapts to changing circumstances. See Oliver Wendell Holmes, Jr., *The Common Law* (New York: Dover Publications, Inc., 1991), p 1 (noting that the common law is affected by "the felt necessities of the time, the prevalent moral and political theories, [and] intuitions of public policy" and that it "embodies the story of a nation's development through many centuries"). And as this Court stated in *Beech Grove Investment Co v Civil Rights Comm*:

> It is generally agreed that two of the most significant features of the common law are: (1) its capacity for growth and (2) its capacity to reflect the public policy of a given era.
>
> *   *   *
>
> "The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles which are designed to meet, and are susceptible of adaption to, among other things, new institutions, public policies, conditions, usages and practices, and changes in mores, trade, commerce, inventions, and increasing knowledge, as the progress of society may require. So, changing conditions may give rise to new rights under the law . . . ." [*Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 429-430; 157 NW2d 213 (1968), quoting CJS, Common Law, § 2, pp 43-44.]

The common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of

7

changing times and circumstances. *In re Arbitration Between Allstate Ins Co & Stolarz*, 81 NY2d 219, 226; 597 NYS2d 904; 613 NE2d 936 (1993) (noting that the law evolves through the "incremental process of common-law adjudication as a response to the facts presented");[6] see also *People v Aaron*, 409 Mich 672, 727; 299 NW2d 304 (1980) ("Abrogation of the felony-murder rule is not a drastic move in light of the significant restrictions this Court has already imposed. Further, it is a logical extension of our decisions . . . .").

## B. COMMON LAW AUTHORITY

The lead opinion acknowledges that this Court "unquestionably" has the authority to modify the common law.[7] *Ante* at 2. This authority is traceable to Const 1963, art 3, § 7, which provides:

> The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.

As stated in *Myers v Genesee Co Auditor*, 375 Mich 1, 7; 133 NW2d 190 (1965) (opinion by O'HARA, J.): "'Amendment' and 'repeal' refer to the legislative process. 'Change'

---

[6] See also Kestin, *The bystander's cause of action for emotional injury; Reflections on the relational eligibility standard*, 26 Seton Hall L R 512, 512 (1996) ("Growth in the common law is incremental, often scarcely noticeable in the short run, but inexorable when viewed in the long term."); *Davis v Moore*, 772 A2d 204, 238 (DC, 2001) (Ruiz, J., dissenting) ("It cannot be forgotten that the incremental pace at which common law develops, coupled with the increasing importance of statutory law, ensures that cases where truly 'new' rules of common law are announced . . . will not frequently occur.").

[7] This Court's authority to alter the common law has also been described as "axiomatic." *North Ottawa Community Hosp v Kieft*, 457 Mich 394, 403 n 9; 578 NW2d 267 (1998).

8

must necessarily contemplate judicial change. The common law is not static, fixed and immutable as of some given date." Thus, the ability to alter the common law is constitutionally vested in both the Legislature and the judiciary. There is no violation of separation-of-powers principles under Const 1963, art 3, § 2, when the judiciary alters the common law because that power is given to both branches to exercise through means and procedures that are proper to each.[8] The common law is, thus, law subject to continuing judicial and legislative development.[9]

---

[8] While this Court's authority to alter *civil* common law is unquestioned, our authority to alter *criminal* common law has been the subject of debate. See, e.g., *In re Lamphere*, 61 Mich 105, 109; 27 NW 882 (1886) ("Whatever elasticity there may be in civil matters, it is a safe and necessary rule that criminal law should not be tampered with except by legislation."). *Lamphere* was cited with approval in *People v Riddle*, 467 Mich 116, 126; 649 NW2d 30 (2002), yet notwithstanding *Lamphere* this Court has altered criminal common law on several occasions. See, e.g., *People v Stevenson*, 416 Mich 383, 392; 331 NW2d 143 (1982) (rejecting the common-law "year and a day" rule and stating that "no limitation upon this Court's authority to 'enlarge' common-law criminal liability appears in Const 1963, art 3, § 7 or can be fairly implied from its language"). In *Aaron*, 409 Mich at 733, this Court stated, "Today we exercise our role in the development of the common law by abrogating the common-law felony-murder rule." Further, in *People v Kevorkian*, 447 Mich 436, 445; 527 NW2d 714 (1994), this Court rejected the common-law definition of "murder" to the extent it could be read to encompass the act of intentionally facilitating the commission of suicide. And in *People v Kreiner*, 415 Mich 372; 329 NW2d 716 (1982), we essentially held that the Michigan Rules of Evidence constituted a codification of the rules of evidence that superseded common-law rules.

[9] Although it is undeniably true that this Court's exercise of the "judicial power" generally involves declaring only what the law "is," as opposed to what it "ought" to be, *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 66; 718 NW2d 784 (2006), citing *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), the quasi-legislative exercise that characterizes our common-law authority is an exception to this general rule. Nonetheless, such common-law authority constitutes a traditional part of the exercise of Michigan's "judicial power," just as it does in most states. Ultimately, the "judicial power" of this Court is the sum of the powers that have been conferred upon us by our laws and constitution.

The lead opinion contends that this Court is less well positioned than the Legislature to decide whether the common law should be altered.[10]  Although there may well be instances in which this is true, and in which prudence would dictate that we defer to the Legislature, I do not know why this should invariably be true.[11]  The common law of parental waivers has been a matter of longstanding judicial interest in this state, the legal rights of children is an issue well known to this Court in a wide variety of contexts,

[10] Notwithstanding this assertion, I note that the author of the lead opinion has also authored and joined opinions in which this Court has altered the common law, as have other members comprising the majority in this case.  See, e.g., *Ritchie-Gamester v City of Berkley*, 461 Mich 73, 89; 597 NW2d 517 (1999); *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 606; 614 NW2d 88 (2000); *James v Alberts*, 464 Mich 12, 18; 626 NW2d 158 (2001).  Moreover, in at least *Ritchie-Gamester* and *James*, the common law was not merely being clarified, as it is here, but was clearly being altered.  Why is the Legislature the proper institution for addressing the common law in the instant case, but not in those prior cases?  The lead opinion provides no standards in this regard, and indeed offers nothing more than the conclusion that the instant matter is better left for the Legislature, even though for more than a century it has been a matter left to the judiciary.

[11] The lead opinion accurately notes that this Court decides cases and controversies involving individual parties.  But it overstates its case when it asserts that we do not give consideration to the views of nonparties.  Indeed, justices routinely remind attorneys arguing before this Court that the rule to be formulated by this Court in both common-law and non-common-law cases must be just and reasonable, not only for their individual case, but also for the 100 or 1,000 forthcoming cases that will involve similar legal issues.  Moreover, we routinely receive amicus curiae briefs from interested individuals and organizations, just as we have in this case.  If the lead opinion's point is that our common-law decisions require justices to think along somewhat different lines than is required by our other areas of responsibility, I concur.  If, however, its point is to suggest the wisdom of retreating from a responsibility that has belonged to Anglo-American courts for 500 years or so, I respectfully disagree.  In any event, the lead opinion *does* reach its conclusions about this case on the basis of its author's *own* views of the common law.  And further, if this Court did nothing at all to maintain the common law, existing common law would remain in place-- at least until the Legislature decided, if ever, to alter it-- and it would still have to be interpreted by some court, just as occurred here.  It just happens in the instant case that the lead opinion is apparently in agreement with the interpretation of the Court of Appeals.

10

the judiciaries of most other states have addressed the common law of parental waivers, and the immediate dispute involves only whether to clarify, or 'fine-tune' at the margins, a common-law rule of considerable vintage. Each of these factors implicates exactly the kind of decision-making that typifies the evolution of the common law. Our constitution gives the judiciary the authority to change the common law because the common law *is* "judge-made law." *Placek*, 405 Mich at 657. And it is well recognized that rules that were "judge-invented" can be "judge-reinvented," "judge-uninvented," or, as I believe is required in this case, "judge-clarified." See *Montgomery v Stephan*, 359 Mich 33, 49; 101 NW2d (1960). As was stated in *Moning v Alfono*, 400 Mich 425, 436; 254 NW2d 759 (1977): "The law of negligence was created by common-law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law *absent* legislative directive."

I would further observe that in *Henry v Dow Chem Co*, 473 Mich 63, 83; 701 NW2d 684 (2004), which the lead opinion cites, this Court explained that it is "the *principal* steward of Michigan's common law."[12]  (Emphasis added.)  And in *Burns v Van Laan*, 367 Mich 485, 494; 116 NW2d 873 (1962), we stated, "In that great field where the common law grows or withers the judiciary is the *primary* actor." (Emphasis

---

[12] See also *Gruskin v Fisher*, 405 Mich 51, 58; 273 NW2d 893 (1979) (noting that "it is for this Court to decide whether a common-law rule shall be retained unless the Legislature states a rule that is inconsistent with or precludes a change in the common-law rule").

added.)[13]  Then, in *Placek*, 405 Mich at 657, 659, we reiterated that this Court may alter

the common law through its decisions: "[W]hen dealing with judge-made law, this Court

---

[13] This Court, in lieu of the Legislature, has altered the common law over the last 40 years on numerous occasions.  See, e.g., *Daley v LaCroix*, 384 Mich 4, 12-13; 179 NW2d 390 (1970) (rejecting the "impact" requirement for common-law claims for emotional distress proximately caused by a defendant's negligent conduct); *Womack v Buchhorn*, 384 Mich 718, 724-725; 187 NW2d 218 (1971) (rejecting the common-law disallowance of recovery for negligently inflicted prenatal injury); *Plumley v Klein*, 388 Mich 1; 199 NW2d 169 (1972) (abolishing the common-law rule that children cannot bring a tort cause of action against their parents); *Pittman v Taylor*, 398 Mich 41; 247 NW2d 512 (1976) (abrogating the common-law doctrine of state governmental immunity); *Serafin v Serafin*, 401 Mich 629; 258 NW2d 461 (1977) (abolishing Lord Mansfield's rule, which prevented spouses from testifying that they had no access to each other at the time a child was conceived to prove the husband's lack of paternity); *Gruskin*, 405 Mich at 58, 70-71 (rejecting the common-law rule that forfeiture of a land contract is considered an election of remedy); *Placek*, 405 Mich at 656-657 (abolishing common-law contributory negligence as a total bar to recovery and adopting pure comparative negligence); *Toussaint v Blue Cross & Blue Shield of Mich*, 408 Mich 579, 615; 292 NW2d 880 (1980) (making employer policies and procedures a legally enforceable part of an employment relationship if such policies and procedures instill "legitimate expectations" of job security); *Aaron*, 409 Mich at 723 (abolishing the common-law felony-murder rule); *Berger v Weber*, 411 Mich 1; 303 NW2d 424 (1981) (expanding the common law to permit a child to recover money damages for the lost society and companionship of a negligently injured parent, notwithstanding the argument that the Legislature was in the best position to determine whether this new cause of action should be instituted and what limits should be placed on it); *Kreiner*, 415 Mich at 377 (holding that Michigan's common-law tender-years rule, which permitted excusable delay in reporting certain crimes against minors, did not survive the adoption of MRE 803[2]); *Stevenson*, 416 Mich at 392 (abolishing the common-law year-and-a-day rule in homicide cases); *Kevorkian*, 447 Mich at 494 (rejecting the common-law definition of "murder" to the extent it could be read to encompass intentionally providing the means by which a person commits suicide); *Bertrand v Alan Ford, Inc*, 449 Mich 606; 537 NW2d 185 (1995) (applying the common-law open-and-obvious-danger doctrine to claims of premises liability); *Ritchie-Gamester*, 461 Mich at 89 (specifically modifying the common law of torts regarding recreational activities by adopting reckless misconduct as the minimum standard of care for co-participants in recreational activities); *Stitt*, 462 Mich at 606 (holding, as a matter of premises liability law, that church visitors are not invitees); and *James*, 464 Mich at 18 (abolishing the common-law "volunteer" doctrine); see also *Ghaffari v Turner Constr Co*, 473 Mich 16, 25-26; 699 NW2d 687 (2005) (clarifying that the open-and-obvious-danger doctrine has no

12

in the past has not disregarded its corrective responsibility in the proper case. . . . [The courts] are certainly in as good, if not better, a position to evaluate the need for change, and to fashion that change." In *People v Stevenson*, 416 Mich 383, 390; 331 NW2d 143 (1982), we stated, "This Court has often recognized its authority, indeed its duty, to change the common law when change is required." And in *Adkins v Thomas Solvent Co*, 440 Mich 293, 317; 487 NW2d 715 (1992), we asserted: "When appropriate, we have not hesitated to examine common-law doctrines in view of changes in society's mores, institutions, and problems, and to alter those doctrines where necessary."

For these reasons, I reject the Court of Appeals' statement that "we can neither judicially assume nor construct exceptions to the common law extending or granting the authority to parents to bind their children to exculpatory agreements. Thus, the designation or imposition of any waiver exceptions is solely within the purview of the Legislature." *Woodman v Kera, LLC*, 280 Mich App 125, 149; 760 NW2d 641 (2008) (opinion by TALBOT, J.). Far more accurately, as Judge BANDSTRA stated, the issue is for

---

applicability to a claim under the common-work-area doctrine). And, concomitantly, there have been occasions on which this Court has rejected requests to alter the common law. See, e.g., *In re Certified Question*, 479 Mich 498, 521-522; 740 NW2d 206 (2007) (declining to expand the common law to impose a duty on a landowner to anybody who comes into contact with somebody who has been on the landowner's property because it would expand traditional tort concepts beyond manageable bounds); *Wold Architects & Engineers v Strat*, 474 Mich 223, 236; 713 NW2d 750 (2006) (declining to reject Michigan's common-law arbitration-unilateral-revocation rule, being "unpersuaded that the time is ripe to change" the rule); *Henry*, 473 Mich at 68, 89 ("[a]lthough . . . recogniz[ing] that the common law is an instrument that may change as times and circumstances require," declining to expand the common law to recognize a medical monitoring cause of action, noting that it might "lead to dramatic reallocation of societal benefits and burdens").

"*either* the Michigan Legislature or our Supreme Court . . . ." *Id.* at 157 (BANDSTRA, J., concurring) (emphasis added).

## C. COMMON-LAW PRINCIPLES

The lead opinion correctly states that when deciding whether to clarify or change the common law, this Court should consider existing sources of public policy, such as statutes and other court decisions setting forth common-law doctrines.[14] As a starting point, we inquire whether the Legislature has already spoken regarding the specific issue.[15] If not, we then inquire whether the Legislature has preempted a particular area of

---

[14] As this Court emphasized in *Terrien v Zwit*, 467 Mich 56, 67; 648 NW2d 602 (2002): "The public policy of Michigan is *not* merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law." The focus of the judiciary must ultimately be on the policies that, in fact, have been adopted by the public through our various legal processes and that are reflected in our state and federal constitutions, our statutes, the common law, and administrative rules and regulations. *Id.* at 71 n 11.

[15] "[L]egislative amendment of the common law is not lightly presumed." *Wold Architects*, 474 Mich at 233. Rather, the Legislature "should speak in no uncertain terms" when it exercises its authority to modify the common law. *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006). See also *Burns*, 367 Mich at 492 n 5, in which we approvingly quoted Judge Benjamin N. Cardozo:

> "When the legislature has spoken, and declared one interest superior to another, the judge must subordinate his personal or subjective estimate of value to the estimate thus declared. He may not nullify or pervert a statute because convinced that an erroneous axiology [set of values] is reflected in its terms." [Citation omitted.]

I note further that the Legislature has forbidden prospective waivers of certain rights. For example, the Worker's Disability Compensation Act states: "No [preinjury] agreement by an employee to waive his rights to compensation under this act shall be valid . . . ." MCL 418.815. The Michigan Employment Security Act states: "No agreement by an individual to wave [sic], release, or commute his rights to benefits or any other rights under this act from an employer shall be valid." MCL 421.31. And the teacher tenure act provides: "No teacher may waive any rights and privileges under this

the law.[16] When we determine that the Legislature has not specifically spoken, and has not preempted the adoption or revision of a new common-law rule, we consider whether a clarification or change of the common law is warranted in light of a variety of factors discussed herein.

As noted, "we have not hesitated to examine common-law doctrines in view of changes in society's mores, institutions, and problems, and to alter those doctrines where necessary." *Adkins*, 440 Mich at 317. But as counseled in *People v Kevorkian*, 447 Mich 436, 482 n 60; 527 NW2d 714 (1994) (opinion by CAVANAGH, C.J., and BRICKLEY and GRIFFIN, JJ.), citing Judge Cardozo's *The Nature of the Judicial Process*:

> The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. He is to exercise a discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to the primordial necessity of order in the social life. Wide enough in all conscience is the field of discretion that remains. [Quotation marks and citations omitted.][17]

---

act in any contract or agreement made with a controlling board." MCL 38.172. Here, however, the Legislature has in no way forbidden releases in which a parent prospectively waives a child's negligence claims.

[16] See, e.g., *Jackson v PKM Corp*, 430 Mich 262, 278; 422 NW2d 657 (1988) ("The Legislature intended the dramshop act to afford the exclusive remedy for injuries arising out of an unlawful sale, giving away, or furnishing of intoxicants thereby preëmpting all common-law actions arising out of these circumstances."); *Hoerstman Gen Contracting*, 474 Mich at 74 (". . . Article 3 of the [Uniform Commercial Code] is comprehensive. It is intended to apply to nearly every situation involving negotiable instruments.").

[17] Concerning the common law, Oliver Wendell Holmes, Jr., stated that it is predicated, not upon logic, but upon experience. Holmes, *The Common Law*, p 1.

It is also the case that "endeavoring to uncover the doctrinal underpinnings of common-law rules can be an effective-- if not essential-- way of determining whether a suggested [clarification or] change [to a common-law rule] is warranted." Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 309 (2004); see also *Montgomery*, 359 Mich at 49 ("The reasons for the old rule no longer obtaining, the rule falls with it.");[18] *James v Alberts*, 464 Mich 12, 17; 626 NW2d 158 (2001) (abolishing the volunteer doctrine because "the fellow-servant rule, which created the need for the volunteer doctrine, was no longer part of our law"). Thus, when the common-law rationale for a particular rule has dissipated, the rule itself may be subject to revision or change.

Courts also consider other relevant, though not directly applicable, statutes in determining whether to clarify or change the common law because

> "legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus

---

[18] Judge Cardozo, in his William L. Storrs Lectures before the Yale University Law School in 1921, had this to say:

> There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. [Cardozo, *The Nature of the Judicial Process* (New Haven: Yale University Press, 1921), p 151.]

In the case at bar, there is no hint that either party operated as if the common-law rule adopted here by a majority of justices (that a parent may not waive his or her child's negligence claim prospectively in order to participate in a sporting or recreational activity) determined their conduct. Indeed, the precise opposite is true: a waiver purporting to have exactly the opposite effect was signed.

16

established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction *but also in those of decisional law.*" [*Moning*, 400 Mich at 453-454, quoting *Moragne v States Marine Lines, Inc*, 398 US 375, 390-391; 90 S Ct 1772; 26 L Ed 2d 339 (1970).]

Thus, we also look to (1) actual social customs and practices, and changes in such customs and practices, (2) the doctrinal underpinnings of a common-law rule and their continuing relevance, (3) related statutes and case-law, and (4) the extent to which existing rules may reasonably be supposed to have influenced or determined the conduct of the litigants. But in the final analysis, we ask ourselves, what common-law rule would best serve the interests of Michigan citizens while taking into consideration the prevailing customs and practices of the people?[19]

III. PARENTAL PREINJURY WAIVERS

The justices in the majority assert that under existing Michigan common law, a preinjury release signed by a parent waiving a child's negligence claim in order to enable that child to participate in a sporting or recreational activity is unenforceable. However, they do not cite a single Michigan case holding that a preinjury parental waiver is

_____

[19] As stated in *Stitt*, 462 Mich at 607 "[I]n exercising our common-law authority, our role is not simply to 'count heads' but to determine which common-law rules best serve the interests of Michigan citizens." The lead opinion asks whether a parental preinjury waiver is "ever" in the best interests of a child who becomes injured. *Ante* at 22-23. However, the proper question would take into consideration the interests of *all* children whose parents sign a preinjury waiver, as well as the interests of *all* children whose access to sporting or recreational activities might be adversely affected by rule the majority favors, not merely those very few children whose parents have signed a preinjury waiver and who later suffer an injury. If we could look into the future and know which children will, in fact, be injured after a preinjury waiver has been signed, we would, of course, have to conclude that it would have been better if it had not been signed. The lead opinion's is a misleading and skewed question. As we stated in *Stitt*, our inquiry should be what rule best serves Michigan's citizens in general.

17

unenforceable.[20]  Instead, they only cite cases involving parental waivers of existing claims.  Until today, Michigan's common-law rule against parental waivers has only been applied to the latter claims.  I would not, as do the justices comprising the majority, extend our common-law rule against postinjury parental waivers to preinjury parental waivers.  These waivers are very different.

The trial court held that the preinjury waiver here was enforceable, specifically noting the absence of "any Michigan case which says that a parent who signs a waiver like this one prior to a child engaging in an activity is engaging in an act which is a legal nullity."  Similarly, Judge BANDSTRA correctly stated, "There is no Michigan precedent explicitly discussing whether the postinjury rule against parental waivers should apply in a preinjury case."  *Woodman*, 280 Mich App at 157 (BANDSTRA, P.J., concurring).  And Judge SCHUETTE also correctly remarked upon "the dearth of preinjury, parental-waiver-of-liability cases in Michigan . . . ."  *Id*. at 163 (SCHUETTE, J., concurring).

If the justices who make up the majority are correct that current Michigan common law precludes the enforcement of preinjury parental waivers, then the lack of any earlier decision actually stating this proposition is, to say the least, noteworthy, especially given that such waivers have been commonplace in this state and our country

---

[20] Justice HATHAWAY's opinion states, "[T]he fact is that preinjury waivers have never been enforced or considered enforceable by the courts of this state."  *Ante* at 1-2. But also like the lead opinion, she does not cite a single Michigan case in which a preinjury waiver of a child's negligence claim has been deemed unenforceable. Obviously, neither of the parties in the *instant* case was similarly apprised that preinjury waivers have never been enforced or considered enforceable.  Nor were the countless numbers of sporting and recreational providers and the parents of children participating in sporting and recreational activities who have signed preinjury waivers over the decades. Nor, for that matter, was the trial court judge or two judges of the Court of Appeals.

18

for decades.  The lead opinion rightly states, "The underlying facts are simple *and likely familiar* to many parents with young children."  *Ante* at 3 (emphasis added).  Doubtless, the facts are "likely familiar" precisely because generations of parents have routinely been confronted with such waivers as a condition to their children's participation in sporting and recreational activities.  As Judge SCHUETTE observed: "[A]n immense amount of youth activities-- church groups, Boy Scouts, sports camps of all kinds, orchestra and theatrical events, and countless school functions-- run and operate on release and waiver-of-liability forms for minor children."  *Id*. at 163-164 (SCHUETTE, J., concurring).  In view, therefore, of the facts that (1) preinjury parental waivers have been ubiquitous in this state for decades, enabling children to participate in a wide array of sporting and recreational activities that might otherwise not be available, and (2) there is no Michigan case that has ever held that a parental preinjury waiver is unenforceable, or otherwise prohibited or contrary to public policy, what exactly is the basis for the confident assertion by a majority of justices that such waivers are unenforceable in this state?

The lead opinion correctly observes that in *McKinstry v Valley Obstetrics-Gynecology Clinic, PC*, 428 Mich 167, 192-193; 405 NW2d 88 (1987), this Court set forth "the common-law rule that a parent has no authority to waive, release, or compromise claims by or against a child."  This statement, however, was made in the course of an opinion that held that a particular statute created an *exception* to this common-law rule, and the cases cited in *McKinstry* in support of this rule all involved *existing* claims.  *McKinstry* did not assert that the common-law rule applies to preinjury

19

parental waivers, and it did not hold that such waivers are unenforceable. To make the point as clearly as possible, until the instant Court of Appeals decision, *no* existing Michigan case had held that the rule barring parental waivers applied in the preinjury context, and none had applied the rule in such a context, notwithstanding the familiarity of such waivers in this state. Thus, the precise question before this Court is genuinely an issue of first impression in this state.

## IV.  APPLICATION OF THE COMMON-LAW

On the basis of the following considerations, I believe that the common law in our state should be clarified to hold that parental preinjury waivers are enforceable: (1) statutes and caselaw that have enhanced the legal autonomy of minors, (2) statutes and caselaw that have recognized parents' authority to undertake important decisions regarding their children, (3) decisions of the United States Supreme Court that have 'constitutionalized' the rights of fit parents to undertake important decisions regarding their children, (4) statutes and caselaw that have granted protections to recreational providers, (5) freedom of contract principles, (6) evolution of the litigative environment in recent decades, and (7) persuasive decisions from other jurisdictions.

## A.  AUTHORITY OF MINORS

The lead opinion acknowledges six statutory exceptions to the rule that a minor lacks the capacity to contract. *Ante* at 8 n 14. Despite this list, however, the justices in the majority give no apparent weight to these exceptions. In reality, there are a far greater number of statutory exceptions to the two common-law rules that form the basis

20

of the decision here, namely that (1) a child cannot bind himself or herself by contract and (2) a parent cannot bind a child by contract.

Concerning the common-law rule that a child cannot bind himself or herself by contract, the lead opinion acknowledges the common-law exception that a child can do so by a contract for necessaries.[21] It also notes a statutory exception, MCL 600.1403, that provides that an infancy defense will not be recognized for breach of contract if a minor willfully misrepresented his or her age when entering into a contract. Under the common law, a child was not considered an adult until age 21, but our Legislature reduced this age to 18 in 1971,[22] and for criminal matters, the effective age of majority is now 17.[23]

---

[21] *Publishers Agency, Inc v Brooks*, 14 Mich App 634; 166 NW2d 26 (1968) (recognizing that minors are liable for contracts to purchase necessaries).

[22] The Age of Majority Act, MCL 722.51 *et seq*., effective January 1, 1972. Under MCL 722.52(1), a person who attains the age of 18 "is an adult of legal age for all purposes whatsoever, and shall have the same duties, liabilities, responsibilities, rights, and legal capacity as persons heretofore acquired at 21 years of age." But one still must be 21 in order to lawfully purchase or consume alcoholic beverages under an amendment of our constitution that was adopted in 1978. Const 1963, art 4, § 40; see MCL 722.52(1).

[23] MCL 712A.2(a)(1) provides that the family division of circuit court has "[e]xclusive original jurisdiction superior to and regardless of the jurisdiction of another court" in proceedings concerning minors under the age of 17 who violated a municipal ordinance or a state or federal law. Indeed, the common law's solicitude toward minors has been diminished dramatically with respect to criminal law. Pursuant to MCL 769.1(1), a court must sentence a juvenile convicted of any one of 12 specified serious felonies in the same manner as an adult. See also MCR 6.931(A). In 1996, the Michigan Legislature amended the state's juvenile code, allowing a child of any age to be tried and sentenced in the family division of circuit court in the same manner as an adult. This procedure may take place either at the discretion of the prosecutor for certain "specified juvenile violations," MCL 712A.2d(1), or by order of the court following a request by the prosecutor and a hearing for any other offense, MCL 712A.2d(2). In 1997, an 11 year old was charged by the prosecutor as an adult, pursuant to this statute, with first-degree

21

The common-law rule that a child is incompetent to enter into a contract has other exceptions. As a result of legislation,[24] minors can now enter into enforceable contracts in these additional situations: (1) upon being emancipated by the family division of circuit court,[25] (2) upon getting married,[26] (3) upon entering into active duty with the United States military,[27] (4) in order to open a savings account,[28] (5) in order to receive

---

premeditated murder, assault with intent to murder, and two counts of felony-firearm. See *People v Abraham*, 234 Mich App 640; 599 NW2d 736 (1999); *People v Abraham*, 256 Mich App 265; 662 NW2d 836 (2003). Indeed, we are told that the Michigan Department of Corrections currently holds 146 defendants sentenced to life without the possibility of parole who were 16 or younger when they committed their offenses. Note: *A second chance: Michigan's progressive shift in social policy to rehabilitate its mentally ill and juvenile defendants*, 86 U Det Mercy L R 559, 565 (2009).

[24] The lead opinion cites MCL 600.1404(2) (educational loans) as an exception, but this 1970 statute is no longer properly considered an exception because it refers to the enforceability of educational loans entered into by "a minor 18 or more years of age . . . ." When the statute was enacted, the age of majority was 21. Because the age of majority is now 18, the statute is little more than an anachronism.

[25] MCL 722.4e(1)(a) states:

> A minor shall be considered emancipated for the purposes of, but not limited to, all of the following:
>
> (a) The right to enter into enforceable contracts, including apartment leases.

[26] MCL 722.4(2)(a). A minor who is 16 or 17 can marry with the consent of a parent. MCL 551.103(1).

[27] MCL 722.4(2)(c). Under federal law, a 17 year old can join the military with the consent of a parent. See 10 USC 505(a).

[28] MCL 491.614 authorizes the issuance of a savings account to a minor as the sole and absolute owner of the account and authorizes the paying of withdrawals and the performance of acts with respect to the account on the order of the minor with the same effect as if the minor had full legal capacity.

substance abuse treatment,[29] (6) in order to receive treatment for a venereal disease or HIV,[30] (7) in order to receive pregnancy-related services,[31] (8) in order to receive mental health services,[32] and (9) in order to purchase certain insurance policies.[33] All but one of these statutory exceptions were adopted between 1956 and 1980.

Thus, there is a clear trend in Michigan public policy toward giving increased weight to the significant life decisions of minors by allowing them a limited measure of legal autonomy and responsibility. Indeed, minors are also considered competent to

---

[29] MCL 333.6121(1) provides that a minor who is or professes to be a substance abuser may sign a consent to the provision of substance-abuse-related medical or surgical care, treatment, or services by a hospital, clinic, or health professional and that the consent is valid and binding in the same manner as if the minor had achieved the age of majority.

[30] MCL 333.5127(1) provides that a minor who is or professes to be infected with a venereal disease or HIV may sign a consent to the provision of medical or surgical care, treatment, or services by a hospital, clinic, or physician and that the consent is valid and binding in the same manner as if the minor had achieved the age of majority.

[31] MCL 333.9132 provides that a minor may sign a consent to the provision of prenatal and pregnancy-related health care or to the provision of health care for a child of the minor by a licensed health facility or agency or a licensed health professional and that the consent is valid and binding in the same manner as if the minor had achieved the age of majority.

[32] MCL 330.1707 provides:

> A minor 14 years of age or older may request and receive mental health services and a mental health professional may provide mental health services, on an outpatient basis, excluding pregnancy termination referral services and the use of psychotropic drugs, without the consent or knowledge of the minor's parent, guardian, or person in loco parentis.

[33] MCL 500.2205 provides that a life insurance or disability insurance contract made by a person between the ages of 16 and 18 years for the person's benefit or that of a close relative is good and of the same force and effect as though the minor had attained majority at the time of making the contract.

23

waive a variety of rights when charged with a crime. See, e.g., *People v Simpson*, 35 Mich App 1; 192 NW2d 118 (1971), which indicates that minors are competent to waive even constitutional rights when charged with a crime.[34]

The common-law rule that minors are incompetent to enter into contracts was predicated on the idea that minors must be protected from their own contractual follies and exploitation by adults. *Holmes v Rice*, 45 Mich 142; 7 NW 772 (1881); *Frye v Yasi*, 327 Mass 724, 728; 101 NE2d 128 (1951). These purposes comport with common sense and experience, but neither would be undermined by permitting a child's *parents* to exercise their own prudence and judgment on behalf of their minor children in prospectively waiving negligence claims in order to allow their children to participate in recreational activities. As explained in *Parham v J R*, 442 US 584, 602; 99 S Ct 2493; 61 L Ed 2d 101 (1979), there is a presumption that parents possess what a child lacks in maturity, experience, and the capacity for judgment required for making life's difficult decisions. Thus, it is not incompatible with the common-law rule concerning the limited ability of a minor to enter into legal contracts to allow the parent the right to permit or

---

[34] See also *Llapa-Sinchi v Mukasey*, 520 F3d 897, 900 (CA 8, 2008), which explains:

> Minors can be responsible for their own legal status and can waive their constitutional rights. Courts have repeatedly held this, and statutes have long allowed it. The Supreme Court has held minors can be responsible for waiving their right to appeal deportation and custody determinations.

*Llapa-Sinchi* went on to cite cases holding that minors can waive the right to appeal, the right to a jury trial, and the rights guaranteed by *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

deny a child's participation in sporting or recreational activities and to weigh the risks and benefits of that participation.

## B.  PARENTAL AUTHORITY

Concerning the common-law rule that a parent cannot bind a child by contract, the courts and the Legislature have found it increasingly appropriate to allow parents to provide consent to their children's participation in numerous significant activities.  As explained in *Parham*, 442 US at 602:

> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. . . .   The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

More recently, the United States Supreme Court has determined that the right of a parent to decide how a child will be raised is one of the oldest and most fundamental rights emanating from the "liberty" interest of the Due Process Clause of the Fourteenth Amendment.  *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (opinion by O'Connor, J.).  In *Troxel*, a plurality cited the Court's long history of recognizing that the family is a unit within which parents possess "'broad . . . authority over minor children.'"[35]  *Troxel*, 530 US at 66, quoting *Parham*,  442 US at 602.  *Troxel* also indicated that courts may not overturn decisions by a fit custodial parent "solely on [the basis of] the judge's determination of the child's best interests."  *Troxel*, 530 US at

---

[35] "It is the natural, fundamental right of parents and legal guardians to determine and direct the care, teaching, and education of their children."  MCL 380.10 (part of the Revised School Code).

25

67. Rather, courts must give some "special weight" to the parents' determination of their children's best interests. *Id.* Indeed, in *Hunter v Hunter*, 484 Mich 247, 258 n 16, 262; 771 NW2d 694 (2009), this Court recognized that *Troxel* "included forceful language describing the significance of parents' fundamental liberty interest in the care, custody, and control of their children" before proceeding to hold that "*Troxel* established a floor or minimum protection against state intrusion into the parenting decisions of fit parents." Considering the breadth and significance of the constitutional right of a fit parent to raise a child as that parent deems appropriate, I would clarify that parental preinjury waivers are enforceable, in part on the basis of this constitutional development.

There is also Michigan caselaw indicating that parents can consent to a variety of actions having serious consequences for their children. *In re Rosebush*, 195 Mich App 675, 682-683; 491 NW2d 633 (1992), for example, held that parents are empowered to make decisions regarding withdrawal or withholding of lifesaving or life-prolonging measures on behalf of their children because the right of the parent to speak for the minor child is embedded within our common law. To put it starkly, then, although the common law allows a parent to unilaterally deny or withdraw even life-prolonging medical care for his or her child if the child is seriously injured while participating in a recreational or sporting activity, a majority of justices would deny the same parent the right to prospectively waive a negligence claim that would allow the same child to participate in a 'Bounce Party,' or some other sporting or recreational activity, in the first place. And in *People v Goforth*, 222 Mich App 306; 564 NW2d 526 (1997), the Court of Appeals held that parents may consent to a police search of their child's bedroom

26

even though such consent could have serious consequences if contraband or other evidence of criminal activity were found in the minor's room. Moreover, in *People v Givans*, 227 Mich App 113, 116, 123-124; 575 NW2d 84 (1997), the Court of Appeals affirmed the defendant's conviction in a case in which the parent consented to have her child interrogated by the police out of her presence-- even though the questioning produced a confession to the crime.

In the face of the broad authority parents have regarding the raising of their children, our Legislature has enacted a long list of statutes related to that authority. For example, as a result of legislation, parents can (1) consent to allow their minor daughter obtain an abortion,[36] (2) consent to their minor child's release of his or her child for adoption,[37] (3) consent to their minor child's receiving a tattoo, brand, or body piercing,[38] (4) consent to their minor child's petition for a name change,[39] (5) consent to their minor child's participation in an undercover operation by purchasing or receiving alcoholic liquor under the supervision of a law enforcement agency,[40] (6) consent to their 16- or 17-year-old child's marriage,[41] (7) file a petition for court approval of a kidney donation by their minor child to a close relative if the child is

---

[36] MCL 722.903(1).

[37] MCL 710.43(4).

[38] MCL 333.13102(1).

[39] MCL 711.1(5).

[40] MCL 436.1701(7).

[41] MCL 551.103(1).

at least 14 years old,[42] (8) consent to electroconvulsive therapy or a procedure intended to produce convulsions or a coma for their minor child,[43] (9) consent to the issuance of a level 1 graduated driver's license to their minor child if the child is 14 years and 9 months old or older,[44] (10) consent to their minor child's employment as a golf caddy or as a youth athletic program referee or umpire if the child is at least 11 years old,[45] (11) delegate to another person for up to six months most of the parent's powers regarding care, custody, or property of the minor child by signing a power of attorney,[46] (12) consent to a pawnbroker's purchase of an item from their minor child,[47] (13) consent to allow a merchant to furnish or sell their minor child bulk gunpowder, dynamite, blasting caps, or nitroglycerine,[48] and (14) consent to the sale of a motor vehicle to their minor child.[49] Similarly, as a result of federal legislation, parents can (15) consent to their 17-year-old child's enlisting in the United States military[50] and (16) consent to their minor

---

[42] MCL 700.5105.

[43] MCL 330.1717(1)(b).

[44] MCL 257.310e(3)(c).

[45] MCL 409.103(2)(a) and (b).

[46] MCL 700.5103(1).

[47] MCL 750.137.

[48] MCL 750.327a.

[49] MCL 750.421c.

[50] 10 USC 505(a).

child's participation as a subject in certain kinds of medical research.[51]  Third parties cannot consent to have someone else's child do or receive these things; only the child's *parents* can provide such consent.  This is because, contrary to the assertion of the lead opinion, a parent is not merely tantamount to a "third party" with regard to his or her child.  There is a clear trend in Michigan public policy toward according parents authority to consent to let their children engage in, or experience, a variety of significant activities.  These consent statutes recognize the liberty interest of parents to make important decisions that affect the well-being of their children and acknowledge the constitutional principle that fit parents are presumed to act in the best interests of their children in making those decisions.

As these examples illustrate, current Michigan public policy-- genuine public policy rooted in the statutory and decisional law of this state-- fully recognizes that parents may make important, even life-altering, decisions on behalf of their children.  While the lead opinion cites statutes and common-law doctrines showing the law's general solicitude toward minors[52]-- and who could disagree with such a proposition?--

---

[51] 45 CFR 46.404 through 46.408.

[52] The lead opinion correctly notes, *ante* at 27-28, that the common law generally holds minors to a lower standard than an adult.  But it fails to mention that even infants were liable for their torts at common law.  Indeed, in *Jennings v Rundall*, 101 Eng Rep 1419, 1421-1422 (KB, 1799), Lord Kenyon said, "[I]f an infant commit an assault, or utter slander, God forbid that he should not be answerable for it in a Court of Justice." See also Prosser, Torts (3d ed), § 128, p 1024.  Moreover, our common law provides that "'whenever a child, whether as plaintiff or as defendant, engages in an activity which is normally one for adults only * * * he must be held to the adult standard, without any allowance for his age.'" *Farm Bureau Ins Group v Phillips*, 116 Mich App 544, 547; 323 NW2d 477 (1982), quoting Prosser, Torts (4th ed), § 32, pp 156-157; accord *Constantino*

29

the statutes and cases cited here are in no way inconsistent with those cited by the lead opinion and are fully compatible with a clarification of our common law allowing parents to sign preinjury waivers of negligence claims so their children can participate in recreational and sporting opportunities.[53]  Such clarification would be consistent with, and no more than a logical extension of, existing Michigan public policy based on the trends identified in this section.

## C.  RECREATIONAL ACTIVITIES

The Legislature has also determined that there is a place in society for recreational activities that occasionally produce injuries by enacting standards of care that preclude claims for injuries to participants, regardless of the injured person's age, resulting from the inherent risks of such activities.  As this Court indicated in *Neal v Wilkes*, 470 Mich 661; 685 NW2d 648 (2004), the Legislature enacted Michigan's recreational land use statute, MCL 324.73301, to provide immunity for landowners from personal-injury lawsuits by persons using their property recreationally, regardless of age, i.e., even when

---

*v Wolverine Ins Co*, 407 Mich 896 (1979); *Osner v Boughner*, 180 Mich App 248, 254-257; 446 NW2d 873 (1989) (driving is an adult activity, and when minors drive, they are held to the adult standard of care).

[53] Under the clarifying rule I would adopt, parents would still need judicial approval to settle existing claims involving their children, and even prospective waivers would be ineffective with respect to claims of gross negligence or willful or wanton behavior.  *Lamp*, 249 Mich App at 594 ("[A] party may not insulate himself against liability for gross negligence or wilful and wanton misconduct.").  I also would not allow prospective waivers regarding *compulsory* activities, such as required school classes or events.  See, e.g., *Sharon v City of Newton*, 437 Mass 99, 106; 769 NE2d 738 (2002) (enforcing a release "in the context of a compelled activity . . . might well offend public policy").

minors are injured.[54]  As we discussed in *Anderson v Pine Knob Ski Resort, Inc*, 469

Mich 20; 664 NW2d 756 (2003), the Legislature enacted Michigan's Ski Area Safety

Act, MCL 408.321 *et seq*., to provide immunity for ski-area operators from personal-

injury suits by injured skiers, regardless of the age of the skier.[55]  And as was further

mentioned in *Dale v Beta-C, Inc*, 227 Mich App 57; 574 NW2d 697 (1997), the

Legislature enacted Michigan's Roller Skating Safety Act, MCL 445.1721 *et seq*., to

provide some immunity for roller-skating rink operators from personal-injury suits by

injured skaters, again regardless of the skater's age.[56]  See also the Equine Activity

Liability Act (EALA), MCL 691.1661 *et seq*., which proscribes general claims for

ordinary negligence, regardless of the injured person's age.  In particular, the EALA

---

[54] MCL 324.73301(1) provides:

> Except as otherwise provided in this section, a cause of action shall not arise for injuries to a person who is on the land of another without paying to the owner, tenant, or lessee of the land a valuable consideration for the purpose of fishing, hunting, trapping, camping, hiking, sightseeing, motorcycling, snowmobiling, or any other outdoor recreational use or trail use, with or without permission, against the owner, tenant, or lessee of the land unless the injuries were caused by the gross negligence or willful and wanton misconduct of the owner, tenant, or lessee.

[55] MCL 408.342(2) provides:

> Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary.  Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment.

[56] MCL 445.1725 provides "Each person who participates in roller skating accepts the danger that inheres in that activity insofar as the dangers are obvious and necessary."

31

proscribes liability for injuries resulting from the inherent risks of equine activity.[57] We should give significant weight to the Legislature's expression of the public policy that such activities are worthy of protection, even in light of their risks, and that providers of such activities are entitled to receive some measure of protection from lawsuits in the absence of gross negligence, *even when the participants are minors.*

Similarly, our state's caselaw evidences that Michigan public policy recognizes that there are benefits to recreational activity. In *Benejam v Detroit Tigers, Inc*, 246 Mich App 645, 657-658; 635 NW2d 219 (2001), in which a minor was injured by a flying bat fragment, the Court of Appeals reversed a jury verdict and dismissed the injured minor's claim after adopting the "limited duty doctrine" as a matter of Michigan law.[58] See also *Moning*, 400 Mich at 458, in which this Court said:

> [B]aseball equipment and bicycles . . . are viewed by society essentially as are automobiles in that although children are injured and

---

[57] MCL 691.1663 provides:

> Except as otherwise provided in [MCL 691.1665], an equine activity sponsor, an equine professional, or another person is not liable for an injury to or the death of a participant or property damage resulting from an inherent risk of an equine activity. Except as otherwise provided in [MCL 691.1665], a participant or participant's representative shall not make a claim for, or recover, civil damages from an equine activity sponsor, an equine professional, or another person for injury to or the death of the participant or property damage resulting from an inherent risk of an equine activity.

[58] The Court of Appeals stated:

> [W]e hold that a baseball stadium owner that provides screening behind home plate sufficient to meet ordinary demand for protected seating has fulfilled its duty with respect to screening and cannot be subjected to liability for injuries resulting to a spectator by an object leaving the playing field. [*Benejam*, 246 Mich App at 657-658.]

32

killed riding bicycles and playing baseball, the utility of such activity is regarded by society and all reasonable persons as outweighing the risk of harm created by their manufacture for and marketing to children.

Indeed, in *Ritchie-Gamester v City of Berkley*, 461 Mich at 73, 92 n 13; 597 NW2d 517 (1999), this Court described recreational activities as "valuable" and "important" "social activities." We should take cognizance of and give weight to these judicial decisions when assessing whether there is a public policy favoring parental preinjury waivers as a condition to allowing minors to participate in sporting and recreational activities and how this ought to be reflected in our state's common law.

## D.  FREEDOM OF CONTRACT

The common-law default position is that contracts are enforced. *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002).[59] This freedom of contract is "deeply entrenched in the common law of Michigan." *Id*. at 71 n 19. The lead opinion, however, states that the issue is "whether a minor can be bound by a contract signed on his behalf by a third party." *Ante* at 8. I respectfully disagree with how the lead opinion frames this issue.[60] It errs in characterizing a parent as a "third party" with respect to his or her own child. The better, and more precisely, crafted question is whether a *parent*-- a person

---

[59] I do recognize that some contracts are not enforceable in Michigan as a matter of public policy. See, e.g., *Cudnik v William Beaumont Hosp*, 207 Mich App 378, 389-390; 525 NW2d 891 (1994), which held that on the basis of public policy, "an exculpatory agreement executed by a patient before treatment is not enforceable to absolve a medical care provider from liability for medical malpractice and other acts of negligence related to a patient's medical care."

[60] I certainly agree that a third party cannot bind someone else to a contract. That is, if a parent signs a contract purporting to bind his next door neighbor or the neighbor's child, that contract would obviously be of no effect.

who in the course of caring for his or her child might take actions pertaining to such matters as the location and establishment of a home, schooling, health care, diet and nutrition, discipline, social and family relationships, lifestyle, hobbies, clothing, religion, instruction in values, vacations, and, yes, even recreational activities, to name a few-- may prospectively waive the child's future negligence claim so that the child can participate in a sporting or recreational activity. That is, the relevant question in this case pertains to the rights of a "parent," not those of a "third-party."

The common-law rule that parents are empowered to make important decisions regarding their children was recognized in *In re Rosebush*, 195 Mich App at 682-683. See also *In re LHR*, 253 Ga 439, 445; 321 SE2d 716 (1984) ("The right of the parent to speak for the minor child is . . . imbedded in our tradition and common law . . . ."). Moreover, as previously indicated, caselaw holds that parents are presumed to act in the best interests of their children and are entitled to make judgments and decisions concerning risks to their children. *Parham*, 442 US at 602. The lead opinion discounts this presumption as overbroad, noting that it is not limited to preinjury waivers and could be cited to justify a parent being able to bind a child to any contract. *Ante* at 21. I agree this presumption does not justify allowing a parent to enter into *any* contract that would be binding on a child. But this presumption, now of constitutional dimension, *does* support making parental preinjury waivers of negligence claims enforceable.

Assuming that the release actually waived the child's claim in this case, a *parent* made the decision that the benefits to his child flowing from the waiver outweighed the risks of a broken leg, as was suffered here, or an even more serious injury. Although

34

plaintiff now seeks to avoid his obligations under the waiver on the grounds that it is "unenforceable," the father's waiver was nonetheless entered into voluntarily and knowingly. This Court should not disturb that decision, out of regard for the parent's rights to undertake such decisions for the child, as well as out of regard for traditional 'freedom of contract' principles. A majority of the justices forbid parents under all circumstances to undertake even a perfectly rational decision to assess the risks and benefits when determining what is in the best interests of their children. Instead, such decision-making will now be monopolized by judges, and the answer will always be the same: "No. The parent cannot be permitted to make such a determination." That is, no matter how compelling the child's interest in participating in a sporting or recreational activity, and no matter how slight the risk of a serious injury, the answer will always remain the same. There can be *no* parental preinjury waiver; there can be *no* assessment of the risks and benefits by the person who is constitutionally presumed to be, and who in reality is, more concerned than anyone else in the world about the well-being of that child; and there can be *no* contract freely entered into by adults, both of whom may be exercising entirely reasonable and sound judgments.

The justices in the majority refuse to enforce the preinjury waiver contract, noting that postinjury waivers are not enforced. But I would not extend our common-law rule against postinjury parental waivers to preinjury parental waivers. These situations are quite different. As Judge BANDSTRA stated in his concurrence in the Court of Appeals:

> "'The concerns underlying the judiciary's reluctance to allow parents to dispose of a child's existing claim do not arise in the situation where a parent waives a child's future claim. A parent dealing with an

35

existing claim is simultaneously coping with an injured child; such a situation creates a potential for parental action contrary to that child's ultimate best interests.

"'A parent who signs a release before her child participates in a recreational activity, however, faces an entirely different situation. First, such a parent has no financial motivation to sign the release. To the contrary, because a parent must pay for medical care, she risks her financial interests by signing away the right to recover damages. Thus, the parent would better serve her financial interests by refusing to sign the release.

"'A parent who dishonestly or maliciously signs a preinjury release in deliberate derogation of his child's best interests also seems unlikely. Presumably parents sign future releases to enable their children to participate in activities that the parents and children believe will be fun or educational. Common sense suggests that while a parent might misjudge or act carelessly in signing a release, he would have no reason to sign with malice aforethought.

"'Moreover, parents are less vulnerable to coercion and fraud in a preinjury setting. A parent who contemplates signing a release as a prerequisite to her child's participation in some activity faces none of the emotional trauma and financial pressures that may arise with an existing claim. That parent has time to examine the release, consider its terms, and explore possible alternatives. A parent signing a future release is thus more able to reasonably assess the possible consequences of waiving the right to sue.'" [*Woodman*, 280 Mich App at 158-159 (BANDSTRA, P.J., concurring) (citations omitted).]

I agree with Judge BANDSTRA's observations and have no difficulty concluding that the policy considerations underlying the rule limiting *postinjury* waivers absent judicial approval are sharply distinct from those at issue with respect to the preinjury rule. In particular, the traditional freedom of contract enjoyed by parents with regard to their children argues in favor of allowing enforcement of parental preinjury waivers.

## E.  GROWTH OF LITIGATION

There can also be little denying Judge BANDSTRA's observation that "[a]s this case amply demonstrates, ours is an extremely and increasingly litigious society."[61]  *Id.* at 160. "Children have routinely jumped off playground slides for generations; lawsuits seeking to impose damages on someone else for resulting injuries are only a recent phenomenon." *Id.* at 160 n 2.  As a result of trends toward increasing litigation in modern society, 48 jurisdictions adopted tort reform legislation between 1985 and 1988.  Sanders & Joyce, *Off to the races: The 1980s tort crisis and the law reform process*, 27 Hous L R 207, 220-222 (1990).  Even in 1992 it was stated:

> Few would dispute the proposition that America has become a litigious society and that the preferred method for resolving disputes and achieving social reform is to file lawsuits.  In 1989, close to eighteen million new civil cases were filed in state and federal courts, amounting to one lawsuit for every ten adults. In the federal courts alone, the number of lawsuits filed each year has more than quadrupled in the last thirty years--

---

[61] In 1982 Chief Justice Warren Burger observed:

> One reason our courts have become overburdened is that Americans are increasingly turning to the courts for relief from a range of personal distresses and anxieties.  Remedies for personal wrongs that once were considered the responsibilities of institutions other than the courts are now boldly asserted as "legal entitlements."  The courts have been expected to fill the void created by the decline of church, family, and neighborhood unity.  [Burger, *Isn't there a better way?*, 68 ABA J 274 (1982).]

See also Posner, *The Federal Courts: Crisis And Reform* 55-79 (1985) (explicitly finding a litigation explosion since the 1960's and employing numerous categories of statistics to analyze this dramatic increase), and Olson, *The Litigation Explosion: What Happened When America Unleashed the Lawsuit* (1991).

from approximately 51,000 in 1960 to almost 218,000 in 1990. [Quayle, *Civil justice reform*, 41 Am U L R 559, 560 (1992).][62]

Indeed, this Court has previously expressed "concern over the effect of increased litigation on recreational activities" and identified "clear evidence that litigation can exact a toll on what most would consider valuable social activities." *Ritchie-Gamester*, 461 Mich at 92 n 13. I agree with *Ritchie-Gamester* that "our duty" is to adopt common-law rules that do not create "destructive levels of litigation that will inhibit important social activity." *Id.* at 93 n 13.[63] Unfortunately, the concern expressed in *Ritchie-Gamester* is not shared by a majority of justices here. Indeed, their decision to expressly preclude the enforceability of parental preinjury waivers should be seen for what it is: an *anti-tort-reform* measure that will exact a heavy toll upon valuable social activities. Their decision will encourage the kind of modern litigation that has led to the closing of playgrounds for fear of a child being injured and a lawsuit being filed. See, e.g., *Messina v Dist of*

---

[62] See also Bator, *What is wrong with the supreme court?*, 51 U Pitt L R 673, 676-677 (1990):

> In the 1985 fiscal year there were filed in the federal district courts about 315,000 civil and criminal cases; this is, of course, exclusive of the some 365,000 bankruptcy petitions filed in 1985. (Compare this figure of 315,000 to the total of under 200,000 cases commenced as recently as 1980 and the total of some 120,000 commenced in 1970.) In 1985, these district court cases, together with the work of those administrative agencies reviewed directly in the courts of appeals, generated, in 1985, a total of about 34,000 new cases in the federal courts of appeals (including the Court of Appeals for the Federal Circuit). (This figure of 34,000 should be contrasted with the figure of just over 23,000 such cases in 1980, 11,500 in 1970, and under 4,000 in 1960.).

[63] As stated by the Ohio Supreme Court in *Zivich v Mentor Soccer Club, Inc*, 82 Ohio St 3d 367, 372; 696 NE2d 201 (1998): "[F]aced with the very real threat of a lawsuit, and the potential for substantial damage awards, nonprofit organizations and their volunteers could very well decide that the risks are not worth the effort."

*Columbia*, 663 A2d 535, 538 (DC, 1995) (holding that expert testimony was necessary to establish the standard of care for installation of cushioning under the monkey bars on a playground).[64]

The more litigious our society becomes, the more each injured child becomes a potential plaintiff in a lawsuit and the more sports and recreational providers see the need to obtain waivers in order to avoid lawsuits and remain in business. Thus, I believe that our society's overall increase in litigiousness over recent generations constitutes a substantial change in society's customary practice that supplies an additional reason for this Court to clarify that our common law allows for the enforceability of parental preinjury waivers. A society in which monkey bars and other traditional playground equipment disappear, and in which sports such as dodge ball attract the scrutiny of the

---

[64] In 1996 New York City Parks Commissioner Henry Stern stated, "In today's litigious world, the children come to the playground with parents and the parents come with lawyers." Douglas, *That Upside-Down High Will Be Only a Memory, Monkey Bars Fall to Safety Pressure*, NY Times, April 11, 1996, available at <http://www.nytimes.com/1996/04/11/nyregion/that-upside-down-high-will-be-only-a-memory-monkey-bars-fall-to-safety-pressures.html> (accessed June 10, 2010). Indeed, it was widely reported last year that a child in the New York area sued two coaches along with Little League Baseball Incorporated and the New Springville Little League when he was injured sliding into second base. Nyback, *Staten Island mom settles suit with Little League and coaches over knew injury*, available at <http://www.silive.com/northshore/index.ssf/2009/08/staten_island_mom_settles_suit.html> (accessed June 10, 2010); see also Benard, *Little league fun, big league liability*, 8 Marq Sports L J 93, 98 (1993) ("[O]ur lawsuit happy society has come to view a child's misjudging a fly ball as a cause of action against an individual who may, incidentally, have the most economic wealth."); Doughtery, *This Museum Exposes Kids To Thrills, Chills and Trial Lawyers*, Wall St J, May 1, 2010 (reporting that annual insurance costs for the City Museum in St. Louis Missouri, have risen from about $36,000 since its founding in 1997 to about $600,000 a year, representing about $1 of the museum's $12 admission price), available at <http://online.wsj.com/article_email/SB20001424052702304159304575183463721620890-lMyQjAyMTAwMDAwMTEwNDEyWj.html> (accessed June 10, 2010).

bench and bar, may be a society in which there is less risk of injury, but it is also a society in which the nature of childhood, and the responsibilities of parenthood, are defined very differently than they have by past generations of Americans. Because I see no evidence that community views have altered in this regard, I would maintain the *genuine* common law in this state-- one in which parental preinjury waivers are an ordinary part of the family experience-- not the distorted common law articulated by a majority here.

## F. OTHER JURISDICTIONS

The question whether to enforce parental preinjury waivers of negligence claims so that minors may participate in elective recreational activities has arisen in other states.[65] Numerous out-of-state cases have decided that parental preinjury waivers should be enforced in a wide variety of situations, notwithstanding the common law's obvious solicitude toward children. It is generally seen as being entirely compatible with that solicitude that parents be allowed to undertake certain decisions on behalf of their children, the consequences of which may not be entirely foreseeable. Who normally would be more concerned about, caring toward, and solicitous of the interests of a child than that child's parents? In *Hohe v San Diego Unified School Dist*, 224 Cal App 3d 1559; 274 Cal Rptr 647 (1990), a 15-year-old girl was injured when she volunteered to participate in a hypnotism show sponsored by her school's parent-teacher-student association. Although the minor and her father had signed a waiver form as a condition

---

[65] However, I well recognize that "in exercising our common-law authority, [this Court's] role is not simply to 'count heads' but to determine which common-law rules best serve the interests of Michigan citizens." *Stitt*, 462 Mich at 607.

to her participation in the show, the plaintiff still attempted to hold the school, the association, and the school district liable for her injuries. The appellate court ruled that the release was not void as against public policy.[66]

In *Zivich v Mentor Soccer Club, Inc*, 82 Ohio St 3d 367; 696 NE2d 201 (1998), Pamela Zivich registered her seven-year-old son for soccer. The soccer club required Mrs. Zivich to sign a release form for her son as a part of the registration process. The child was injured at practice, and his parents filed a lawsuit. The court held that a parent can bind a minor child to an exculpatory agreement in favor of volunteers and sponsors of nonprofit sport activities when the cause of action sounds in negligence. The court concluded that no public policy was violated by enforcing the release, stating:

> It cannot be disputed that volunteers in community recreational activities serve an important function. Organized recreational activities offer children the opportunity to learn valuable life skills. It is here that many children learn how to work as a team and how to operate within an organizational structure. Children also are given the chance to exercise and develop coordination skills. Due in great part to the assistance of volunteers, nonprofit organizations are able to offer these activities at minimal cost. . . .

---

[66] *Hohe* stated:

> Hohe, like thousands of children participating in recreational activities sponsored by groups of volunteers and parents, was asked to give up her right to sue. The public as a whole receives the benefit of such waivers so that groups such as Boy and Girl Scouts, Little League, and parent-teacher associations are able to continue without the risks and sometimes overwhelming costs of litigation. Thousands of children benefit from the availability of recreational and sports activities. Those options are steadily decreasing-- victims of decreasing financial and tax support for other than the bare essentials of an education. Every learning experience involves risk. In this instance Hohe agreed to shoulder the risk. No public policy forbids the shifting of that burden. [*Hohe*, 224 Cal App 3d at 1564.]

* * *

[A]lthough Bryan, like many children before him, gave up his right to sue for the negligent acts of others, the public as a whole received the benefit of these exculpatory agreements. Because of this agreement, the Club was able to offer affordable recreation and to continue to do so without the risks and overwhelming costs of litigation. Bryan's parents agreed to shoulder the risk. Public policy does not forbid such an agreement. In fact, public policy supports it. See *Hohe v. San Diego Unified School Dist.* (1990), 224 Cal.App.3d 1559, 1564, 274 Cal.Rptr.647, 649. Accordingly, we believe that public policy justifies giving parents authority to enter into these types of binding agreements on behalf of their minor children. We also believe that the enforcement of these agreements may well promote more active involvement by participants and their families, which, in turn, promotes the overall quality and safety of these activities. . . .

* * *

[W]e hold that parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence. These agreements may not be disaffirmed by the child on whose behalf they were executed. [*Id*. at 371-374.]

In *Sharon v City of Newton*, 437 Mass 99; 769 NE2d 738 (2002), the Court

upheld a release relating to a voluntary high school cheerleading program on the basis of

public policy. The Court stated:

In the instant case, Merav's father signed the release in his capacity as parent because he wanted his child to benefit from participating in cheerleading, as she had done for four previous seasons. He made an important family decision cognizant of the risk of physical injury to his child and the financial risk to the family as a whole. In the circumstance of a voluntary, nonessential activity, we will not disturb this parental judgment. This comports with the fundamental liberty interest of parents in the rearing of their children, and is not inconsistent with the purpose behind our public policy permitting minors to void their contracts.

. . . Our views with respect to the permissibility of requiring releases as a condition of voluntary participation in extracurricular sports activities,

42

and the enforceability of releases signed by parents on behalf of their children for those purposes, are also consistent with and further the public policy of encouraging athletic programs for the Commonwealth's youth. [*Id.* at 108-109.][67]

I acknowledge that some out-of-state cases have refused to enforce parental preinjury waivers. See, e.g., *Cooper v Aspen Skiing Co*, 48 P3d 1229, 1237 (Colo, 2002);[68] *Scott v Pacific West Mt Resort*, 119 Wash 2d 484; 834 P2d 6 (1992); *Hawkins v Peart*, 37 P3d 1062 (Utah, 2001); *Hojnowski v Vans Skate Park*, 375 NJ Super 568; 868 A2d 1087 (2005). However, in my judgment, these decisions rely on the same kind of arguments set forth in the lead opinion and those of Justice HATHAWAY and Chief Justice KELLY and fail to recognize the superior authority of parents, now recognized by

---

[67] See also *Brooks v Timberline Tours Inc*, 941 F Supp 959 (D Colo, 1996) (upholding the enforceability of waivers signed by parents on behalf of their minor child); *Kondrad v Bismarck Park Dist*, 655 NW2d 411 (ND, 2003) (child's negligence claim was barred by a waiver and release signed by his mother regarding an after-school care program when the minor fell on the school grounds while riding a bicycle owned by a child who was not part of the after-school care); *Gonzalez v City of Coral Gables*, 871 So 2d 1067 (Fla App, 2004) (upholding a parental preinjury release executed for a minor's participation in a high school fire-rescue training program); *Rackley v Advanced Cycling Concepts Inc*, 2009 Tex App LEXIS 1888 (2009) (barring the claim of a child injured at a "Pump it Up" party-- a chain of children's party venues featuring inflatable houses, slides, and obstacle courses-- because of a release signed by his parent); *Mohney v USA Hockey, Inc*, 77 F Supp 2d 859 (ED Ohio, 1999) (applying the *Zivich* holding and ruling that "[n]othing in the *Zivich* opinion indicates that its holding should be limited to nonprofit sports organizations that are local in scope"), aff'd in part and rev'd in part on other grounds, 248 F3d 1150 (CA 6, 2001) (stating that parents have the authority to bind their minor children to exculpatory agreements).

[68] The *Cooper* case, however, was legislatively superseded by statute in 2003. As noted in *Pollock v Highlands Ranch Community Ass'n, Inc*, 140 P3d 351 (Colo App, 2006), the statute recognizes a substantive defense to negligence claims that will often operate as a complete bar to relief. The statute provides: "A parent of a child may, on behalf of the child, release or waive the child's prospective claim for negligence." Colo Rev Stat 13-22-107(3). An Alaska statute similarly allows a parent to prospectively waive a child's negligence claim. Alas Stat 09.65.292.

the United States Constitution's Due Process Clause, to make decisions of the present sort on behalf of their children. I find the out-of-state cases allowing parental preinjury waivers of negligence claims far more persuasively reasoned and considerably more in line with the constitutional presumption that parents act in their children's best interests, as well as with Michigan's public policy favoring recreational activities and affording some measure of legal protection to providers of such recreational activities.

Finally, it is at least noteworthy that many legal commentators have come down on the side of the enforceability of parental preinjury waivers. Professor Joseph King, Jr., for example, states, "[Negative] judicial attitudes toward exculpatory agreements signed by parents on behalf of their minor children seem inconsistent with the powers conferred on parents respecting other important life choices." King, *Exculpatory agreements for volunteers in youth activities—The alternative to "Nerf®" tiddlywinks*, 53 Ohio St L J 683, 716 (1992).[69]

## V. CONSEQUENCES

As a result of today's decision holding that parental preinjury waivers are not enforceable, there will be at least the following predictable consequences: (1) this being the first decision in Michigan specifically holding that such waivers are unenforceable, there will be an increase in recreational and sports-related litigation, arising as a

---

[69] See also Comment, *Interscholastic sports: Why exculpatory agreements signed by parents should be upheld*, 76 Temp L R 619 (2003); Comment, *The theory of the waiver scale: An argument why parents should be able to waive their children's tort liability claims*, 36 USF L R 535 (2002); Note, *Scott v Pacific West Mountain Resort: Erroneously invalidating parental releases of a minor's future claim*, 68 Wash L R 457 (1993).

consequence both of now invalid past waivers and the disappearance of future waivers, (2) sporting and recreational opportunities, particularly for minors, will dwindle out of a reasonable fear of tort liability,[70] (3) parents' fundamental interests in making important decisions regarding their children will be curtailed in favor of a rigid judicial policy that prohibits parents from making important decisions concerning their children's participation in recreational and sporting activities,[71] (4) Michigan's erstwhile public policy favoring and encouraging recreational and sporting opportunities for minors will run afoul of its new common law diminishing such opportunities, (5) recreational providers, such as schools and municipalities; organizations, such as the YMCA, Boy Scouts, Girl Scouts, and the 4-H Club; civic and service organizations, such as the Optimists, the Kiwanis Club, the Jaycees, the Lions Club, and the Elks; and local small businesses will all be subject to increased exposure to lawsuits and higher insurance

---

[70] As was recognized in *Nat'l Int'l Brotherhood of Street Racers, Inc v Superior Court*, 215 Cal App 3d 934, 937; 264 Cal Rptr 44 (1989), "many popular and lawful recreational activities are destined for extinction" unless preinjury waivers are enforceable.

[71] I concur with the following dissenting statement in *Hojnowski*, 375 NJ Super 568 at 598 (Fisher, J. concurring in part and dissenting in part):

> I believe a parent also has the right-- with which the state must not interfere-- to decide whether a child may play football or collect sea shells, learn to ride a horse or engage in bird-watching, go skateboarding or only play video games involving animated skateboarders, or engage in any other type of sport or recreational activity that encompasses inherent risks, or those that are sedate, or all such activities, or none. The majority may not view these matters as important, but, important or not, they and countless others ought to be resolved solely within the sphere of the family and, absent the parents' unfitness, it should be beyond our courts' power to say otherwise.

45

costs, which will lead to either a reduction in interest in sponsoring youth activities or an increase in participation costs for minors and their parents, and (6) nonprofit recreational providers will have a more difficult time recruiting volunteers because of their fear of being personally sued if a child is injured.[72]

The rule established here by a majority of justices summarily strikes down tens of thousands of waivers now believed to be valid and enforceable by thousands of providers of recreational and sporting opportunities and the parents of children who partake in such opportunities.[73]  One can then be assured, as certainly as day follows night, that every hard slide at third base, every hockey penalty, every overly aggressive tackle, every slip at an ice arena, every broken leg at a summer camp, every display of carelessness by a six year old, and every collision between two young athletes will be followed by the attentions of a lawyer newly specializing in "recreational and sporting law."  That is, if

---

[72] The lead opinion asserts, remarkably, that if the rule the majority here favors were not adopted, business owners might have a diminished incentive to maintain their property appropriately, resulting in an increased number of injuries to children.  *Ante* at 19-20.  I see just the opposite incentive.  This concern is considerably overblown, in my judgment.  First, providers would continue to be liable when they acted in a grossly negligent manner.  Second, recreational providers of sports and recreational activities to adults already have waivers enforced absent gross negligence, and there is utterly no evidence that those facilities are generally maintained in an unsafe manner.  Third, as noted by the Ohio Supreme Court, "enforcement of [parental waivers] may well promote more active involvement by participants and their families, which, in turn, promotes the overall quality and safety of these activities.  [*Zivich*, 82 Ohio St 3d at 372.]

[73] Regrettably, many of the providers who continue to abide by established customs and practices, and who may only belatedly become aware of today's decision, will learn the hard way that contracts they believed were protecting them and their businesses have become unenforceable.  This is all the more reason why the common law ought to closely reflect the actual customs and practices of the people, so that citizens need not enroll in continuing legal education courses.

some intrepid providers can still be found who are prepared to continue to make available youth recreational and sporting opportunities.

By contrast, enforcing parental preinjury waivers of negligence claims accords respect to the judgments of parents concerning their minor children's welfare, upholds the freedom of contract, encourages safe and available recreational and athletic opportunities, and intelligently and responsibly reconciles competing societal interests in a fashion similar to that of the Legislature in a widening range of areas pertaining to recreational and sporting opportunities. In refusing to permit parental preinjury waivers, the justices in the majority fail to appreciate the destructive impact of their decision on children, parents, and those who finance and provide recreational opportunities.

The clarifying rule I would adopt is consistent with the common law's concern that children generally be protected from their own contractual follies, and it is equally faithful to the common law's concern that parents not act precipitously when releasing an existing negligence claim of their child. This rule is also consistent with the actual practices of the *parties* themselves in this case, as well as with those of Michigan citizens generally. Indeed, it is contrary to our common-law experience not to bring the common law into accord with the *actual* customs and practices of its citizens; rather, those customs and practices lie at the foundation of our common law. In my judgment, the rule that would best serve the interests of Michigan citizens, and that most closely comports with our people's values and traditions, is the rule set forth in this opinion.

## VI. RESPONSE TO JUSTICE HATHAWAY'S OPINION

Justice HATHAWAY's opinion shows particular confusion in its confident and sweeping assertion that "[parental] pre-injury waivers have never been *enforced* or *considered enforceable* by the courts of this state." (Emphasis added.) There is, of course, not the slightest evidence in support of either prong of this assertion. Concerning the first prong, past enforcement, Justice HATHAWAY fails to cite a single judicial decision in this state's history involving a parental preinjury waiver, and given her agreement with the lead opinion that such waivers are "likely familiar" to parents with young children, one might reasonably wonder why the *absence* of such judicial decisions supports her conclusion rather than exactly the opposite conclusion. Concerning the second prong, parental preinjury waivers not being "considered enforceable," there is also not a bit of evidence in support of her position. To the extent that a straightforward and unambiguous waiver is viewed as meaning what it says, there is no reason to suppose that a parent who had signed such a waiver and whose child had been injured in the course of a sporting or recreational activity would even assume that a lawsuit could be brought. While Justice HATHAWAY would apparently tally that parent within the ranks of those who did not "consider enforceable" the waiver, exactly the opposite conclusion is better founded. That is, precisely to the extent that parents shared Justice HATHAWAY's view and did *not* view waivers as enforceable, one would logically surmise that lawsuits would be *brought* and that the *absence* of such lawsuits should be seen not as Justice HATHAWAY does, as evidence of their unenforceability, but as evidence of the opposite. Justice HATHAWAY's premise is necessarily that injured persons reflexively bring

48

lawsuits even when they recognize that they have signed contracts precluding such lawsuits and that their *not* bringing such lawsuits is the equivalent of their viewing the contract as "unenforceable." Hers is a seriously faulty premise and, thankfully, does not yet reflect the norms and values of the people of this state, the instant decision by a majority of justices notwithstanding.

## VII. CONCLUSION

For all the foregoing reasons, I would affirm in part the judgment of the Court of Appeals to the extent that it held that defendant was not entitled to summary disposition, on the alternative ground that the *actual language* of the release at issue did not waive the minor's claims. I would vacate that portion of the Court of Appeals' judgment concluding that a parent cannot waive a minor child's negligence claims prospectively, because the release at issue did not actually do so. I dissent, however, from the decision to extend the common-law rule forbidding a parent to release a child's *existing* negligence claim to further forbid a parent to *prospectively* waive such a claim so that his or her child may participate in recreational or sporting activities. The decision by a majority of justices will have significant consequences that will be felt widely throughout this state, including both an increase in litigation and a reduction in sporting and recreational opportunities for children. Thus, if the enforceability of parental preinjury waivers were properly before us, and it is not, I would clarify that Michigan's common law permits the enforcement of a parental preinjury waiver.

CORRIGAN, J., concurred with MARKMAN, J.

49